

Opinions of the United
States Court of Appeals
for the Third Circuit

10-1-1999

# United States v Pitt

Precedential or Non-Precedential:

Docket 98-7383, 98-7497

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"United States v Pitt" (1999). *1999 Decisions.* Paper 270.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/270

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 1, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-7383 and 98-7497

UNITED STATES OF AMERICA,

v.

RICHARD LYNN PITT,

      Appellant in No. 98-7383

UNITED STATES OF AMERICA,

v.

WILLIAM MICHAEL STRUBE,
also known as Mike Strube,

      Appellant in No. 98-7497

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Judge: Honorable Sylvia H. Rambo
(D.C. Crim. No. 97-00108)

Argued May 26, 1999

BEFORE: GREENBERG and ALITO, Circuit Judges,
and DOWD,* District Judge

(Filed: October 1, 1999)

_____

* Honorable David D. Dowd, Jr., Senior Judge of the United States
District Court for the Northern District of Ohio, sitting by designation.

Bryan S. Walk (argued)
112 Walnut Street
Harrisburg, PA 17101

 Attorney for Appellant
 Richard L. Pitt

Benjamin S. Waxman (argued)
William R. Tunkey
Robbins, Tunkey, Ross, Amsel
Raben & Waxman
2250 Southwest Third Avenue
4th Floor
Miami, FL 33129

 Attorneys for Appellant
 William Michael Strube

David M. Barasch
United States Attorney
Eric Pfisterer (argued)
Assistant United States Attorney
Theodore B. Smith, III (argued)
Assistant United States Attorney
Federal Building
P.O. Box 11754
Harrisburg, PA 17108-1754

 Attorneys for Appellee

OPINION OF THE COURT

DOWD, District Judge.

I. INTRODUCTION

The appellants, Richard Pitt and William Strube, stand convicted of the primary charge of engaging in a 1994 conspiracy to possess with intent to distribute 486 kilograms of cocaine. Richard Pitt was, at the time of the conspiracy, a documented confidential informant for the

2

United States Customs Service. Pitt and Strube defended their conduct with respect to the 486 kilograms of cocaine as a necessary predicate to obtaining, in a reverse sting operation, an enormous quantity of cocaine from the Cali Cartel in Colombia. In preparation, Pitt and Strube purchased the Ridgely Warfield, a sea-going vessel which was to be used to transport the Cali cocaine. Thus the primary defense advanced by Pitt and Strube was that of public authority, recognized by Fed. R. Crim. P. 12.3. The district court's denial of a jury instruction based on the defense of public authority is the primary error advanced in the appeals of Pitt and Strube. We affirm the convictions and sentences.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Richard Pitt, a pilot and a smuggler by trade, enlisted as a documented confidential informant with the U.S. Customs Service in 1992 after his release from a Mexican prison based on a sentence arising from flying a load of cocaine into Mexico from Colombia. In 1993, Pitt brokered a deal between an undercover Customs agent and a group of Mexicans to buy $1.3 million worth of cocaine. The reverse sting was successful and $1.3 million was seized, with Pitt receiving $350,000 for his efforts.

While still working with U.S. Customs Special Agents Roger Bower and Chuck Mohle, Pitt conceived a plan to entice the Cali Cartel to hire him to transport a large quantity of cocaine by an ocean-going vessel. Pitt enlisted Strube in that plan and they acquired the Ridgely Warfield for that avowed purpose. Agents Bower and Mohle were advised on the Pitt-Strube plan. However, Pitt and Strube did not advise the Customs agents that, in the summer of 1994, they were receiving and transporting large shipments of cocaine from Los Angeles to New York. The first shipment of 150 kilograms took place in mid-July; the second shipment of 150 kilograms took place in early August of 1994. A California State police officer intercepted the third shipment of 186 kilograms destined for New York in a vehicle driven by Pitt. Information about the third shipment was obtained by an on-going Title III interception; however, the stop of vehicle was made for the ostensible reason of a

3

traffic violation so as avoid any revelation about the Title III operation. The traffic stop led to the seizure of the 186 kilograms in the third shipment.

During the government's case in chief, persuasive 960<!>testimony was produced which demonstrated the

culpability of Pitt and Strube relating to the first two shipments of cocaine to New York, including the testimony of Pitt's relatives who had been involved in the operation. The recipient of the cocaine in New York, Gloria Ramirez, also testified and accounted for the large sums of cash that were subsequently delivered to Pitt and Strube in payment for the earlier shipments.

The government produced Customs Agents Bower and Mohle who offered extensive testimony about their relationship with Pitt as the documented confidential informant for Customs. They conceded that Pitt had outlined his plan to persuade the Cali Cartel to use the sea-going vessel Ridgely Warfield, to transport cocaine to the United States for seizure. However, they denied any advance information about the Pitt-Strube plan to ship the 468 kilograms of cocaine to New York from Los Angeles. They also insisted that Pitt had been advised by his separate contacts that he was not authorized to engage in criminal conduct as a part of his plan. Pitt also testified at length about his contact with Bower and Mohle and suggested that they had agreed inferentially with criminal conduct to bring about the anticipated large shipment of cocaine by use of sea-going vessel.

In ruling on the Pitt motion for a new trial, the district court summarized his testimony as follows:

> . . . Defendant himself admitted that no one had told him he could sell cocaine for profit. (Trial Transcript ("Tr.") at 1218.) He also acknowledged that he knew it was against U.S. Customs' policy to let drugs "walk" and, therefore, could not get official approval for his operation. (Tr. at 869.) In fact, he admitted hesitating in carrying out his plan once he was requested by the Cali Cartel to make three test runs because he knew it was wrong. (Tr. at 1201.) Further, he did not tell agents Bowers and Mohle the full extent of his plan

4

until after he was arrested. (Tr. at 1181.) Additionally, there was testimony from the agents that they never authorized Defendant to distribute cocaine and that Defendant had been told in the past this could not be done. . . .

(Supplemental Appendix ("S.A.") at 21).

III. DISCUSSION

A. THE DEFENSE OF PUBLIC AUTHORITY

Defendants Pitt and Strube contend that prejudicial error resulted from the district court's refusal to give a jury instruction based on their defense of public authority. Defendants filed a Notice of Intent to Present the Defense of Public Authority pursuant to Fed. R. Crim. P. 12.3 and requested that the district court issue a jury instruction for that defense. The district court declined reasoning that, since Pitt did not have actual authority to empower Strube to move cocaine, Strube was not entitled to an instruction on that defense. Instead, the district court instructed the jury on entrapment by estoppel for Pitt and mistake of fact for Strube.[1]

The district court's refusal to give a requested jury instruction is reviewed for an abuse of discretion. United States v. Gross, 961 F.2d 1097, 1101 (3d Cir.), cert. denied, 506 U.S. 965 (1992). In determining whether the district court abused its discretion, this Court evaluates whether the proffered instruction was legally correct, whether or not it was substantially covered by other instructions, and whether its omission prejudiced the defendant. Id. However, inasmuch as we review a "court's refusal to instruct the jury on a defense theory de novo," United States v. Stewart, ___ F.3d ___, 1999 WL 499881, at *10 (3d Cir. July 16, 1999), it would have been an abuse of discretion if the defendants were entitled to a public authority charge and the court refused to give it.

The defense of "public authority" is based in common

_____

1. Mistake of fact is not a complete defense, but can negate the intent element necessary for a conviction.

5

law. Under the defense, illegal actions committed by a public official or an officer of the law in the course of his duties were not crimes.2 Originally, this defense only applied to cases where the agency possessed the authority to permit the actor to engage in the otherwise illegal conduct and the actor was given permission. Published decisions pertaining to the defense of actual public authority are sparse, possibly because reliance on the defense is rare.

Recognition of the defense of "apparent" public authority appears in United States v. Barker, 546 F.2d 940 (D.C. Cir. 1976), a case related to the infamous Watergate debacle. A divided court of the D.C. Circuit decided that the defense should be extended to an individual who acted at the behest of a government official and in reasonable reliance on that official's authority to permit the behavior. Id. at 948-49. Judge Wilkey, writing for the majority, cited two requirements a defendant must show to excuse his conduct: 1) there were facts justifying defendant's reasonable reliance on the official; and 2) there is a legal theory on which to base a reasonable belief that the official possessed the authority to permit the conduct. Id. at 949. This has become known as the defense of "apparent public authority." This defense differs from actual public authority because the defendant is not required to establish that the government official had the authority to sanction the illegal activity. Instead, the defendant asserts the belief that his action was condoned by the agency which he believed had authorized him to engage in the criminal conduct.

After Barker, the number of cases where the defendant claimed that he was acting under actual or apparent public authority began to increase.3 As a consequence, Congress

_____

2. Often the cases involved police officers and their conduct in the course
of their duties.

3. Many times, defendants claimed they were acting on the authority of the Central Intelligence Agency ("CIA"). See, United States v. Anderson, 872 F.2d 1508 (11th Cir.), cert. denied, 493 U.S. 1004 (1989); United States v. Rosenthal, 793 F.2d 1214 (11th Cir.), modified on other grounds, 801 F.2d 378 (11th Cir. 1986), cert. denied, 480 U.S. 919 (1987); United States v. Smith, 780 F.2d 1102 (4th Cir. 1985); United

6

became concerned with the increasing number of
defendants attempting to utilize this common law defense,
the problems of surprise the defense created at trial and
the subsequent disclosures of confidential information
which the defense often required.4 Therefore, Congress
proposed an addition to the Federal Rules of Criminal
Procedure requiring a defendant to make a pre-trial
disclosure of his intention to use the defense. The proposed
rule was added to the "Omnibus Intelligence and Security
Improvements Act" (H.R. 1082, 1985) and was entitled
"Title II --Intelligence or Law Enforcement Defense Pretrial
Notification Act."

When the Omnibus Intelligence and Security
Improvements Act was not enacted into law, the Justice
Department submitted the proposed rule to the Criminal
Rules Advisory Committee. The Committee prepared and
circulated a proposed rule in September of 1986 requesting
comment, proposed alterations, and possible concerns.
Before the proposed rule emerged from the rule-making
process, it was adopted as part of the Anti-Drug Abuse Act
of 1988 (Pub. L. No. 100-690, S 6483, 104 Stat. 4181).

Since Congress short-circuited the rule-making process
in adding a Rule 12.3 to the Federal Rules of Criminal
Procedure, no Advisory Committee Note ("Note")
accompanies the rule; however, a proposed Note was
submitted in connection with the Criminal Rules Advisory

_____

States v. Wilson, 732 F.2d 404 (5th Cir.), cert. denied, 469 U.S. 1099
(1984); United States v. Wilson, 750 F.2d 7 (2d Cir. 1984), cert. denied,
479 U.S. 839 (1986); United States v. Wilson, 721 F.2d 967 (4th Cir.
1983); United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980). As a
result, the defense of actual or apparent public authority was often
termed the "CIA Defense."

4. In fact, many of the pre-Rule 12.3 public authority cases involve
defendants/appellants claiming error in both the denial of public
authority jury instructions and in excluding evidence supporting their
public authority defense under the Classified Information and
Procedures Act ("CIPA"). CIPA was enacted to reduce the amount of
classified information divulged by requiring pre-trial hearings to
determine the relevance of the evidence.

Committee September 1986 proposal.5 Courts have subsequently looked to that proposed but unadopted Note for guidance as to the scope and application of Rule 12.3.

That Note cites two cases as examples of what the Rule was intended to cover, United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980) and United States v. Wilson, 721 F.2d 967 (4th Cir. 1983). In Sampol, defendants convicted of murder for their role in an assassination appealed the court's refusal to allow their affirmative defense that the CIA authorized the killing. In Wilson, a former intelligence agent was convicted of selling weapons to Libya. On appeal, Wilson claimed he had acted on the good faith belief that his actions were sanctioned by the CIA. The court refused to overturn Wilson's conviction because he had been permitted to introduce evidence of an undercover defense and the jury had rejected it.6

Once Rule 12.3 was enacted, the public authority defense required two components: 1) a procedural component, namely, compliance with the Rule; and 2) a substantive common law component. Rule 12.3 itself is entirely procedural in nature. It is similar to Rules 12.1 and 12.2 which require defendants to give notice for defenses of alibi and insanity. Rule 12.3(a)(1) requires that the defendant file, at the time of pre-trial motions, a notice of intent to use the defense of actual or believed public authority. Rule 12.3(a)(2) also includes disclosure requirements pertaining to witnesses and other evidence. Rule 12.3 does not, however, include a discussion of substantive requirements for the defense. Therefore, the Rule does not alter the common law requirements.

The language of Rule 12.3 enumerates two defenses: 1) actual public authority; and 2) believed or apparent public

_____

5. The Proposal is reprinted at 111 F.R.D. 489, 499.

6. Wilson was unsuccessful in raising this defense in two subsequent trials as well. United States v. Wilson, 732 F.2d 404 (5th Cir. 1984) (determining that refusal to permit "CIA Defense" and good faith defense for his selling of plastic explosives to Libya was not error); United States v. Wilson, 750 F.2d 7 (2d Cir. 1984) (holding that refusal to allow "CIA Defense" for charges of attempted murder and witness tampering was not error).

authority. As already discussed, actual public authority involves a defendant who was authorized to commit the otherwise illegal act, whereas apparent public authority occurs when the defendant was not actually permitted to engage in the criminal activity but believed he was. Just as for actual public authority, the enactment of Rule 12.3 did not alter the defense of apparent public authority. [7] Therefore, jurisdictions where actual authority was required were not altered.

This Court approves and will follow the holding in United States v. Baptista-Rodriguez, 17 F.3d 1354 (11th Cir. 1994), which limits the use of the defense of public authority to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question. As a corollary, Baptista-Rodriguez holds that where the government agent had no such power, the defendant may not rest on the "public authority" defense.

In this case, the unrebutted testimony was that neither Bowers nor Mohle had the authority to empower Pitt to engage in acts alleged and proven with respect to the charged conspiracy. To the contrary, the testimony was to the effect that only the Director of Customs and the Director of the Drug Enforcement Agency, in conjunction with the approval of the United States Attorney for the subject district, could sanction and authorize the type of conduct in which Pitt and Strube engaged with respect to the charged 468 kilograms of cocaine.

The district court did charge the jury, as to Pitt only, with respect to the defense of entrapment by estoppel. This defense arises when a government official tells a defendant that certain conduct is legal and the defendant commits

_____

7. United States v. Cardoen, 898 F. Supp. 1563 (S.D. Fla. 1995), aff'd sub nom United States v. Johnson, 139 F.3d 1359 (11th Cir.), reh'g denied, 149 F.3d 1197 (11th Cir. 1998) (determining that authority relied upon must be real and not apparent), cert. denied, ___ U.S. ___, 119 S.Ct. 2365 (1999); United States v. Rosenthal , 793 F.2d 1214, 1235-37 (11th Cir. 1986) (stating that defendant could only be exonerated if he relied on real and not apparent authority); United States v. Duggan, 743 F.2d 59, 83-84 (2d Cir. 1984) (declining to adopt apparent authority from Barker and instead requiring actual authority).

what otherwise would be a crime in reasonable reliance on the official representation. See Baptista-Rodriguez, 17 F.3d at 1368 n.18 for a comparative analysis of the defenses of innocent intent, public authority, apparent public authority and entrapment by estoppel.

In this case, while there was no testimony by Pitt that he was told by either Bowers or Mohle that he could engage in the indicted activity, Pitt did offer testimony to the effect that he believed he had the implicit authority to engage in whatever criminal activity was necessary in order to entice the Carli Cartel to eventually use his ship to transport the large quantity of cocaine to the United States for seizure and thereby bring about the arrest of persons who would arrive to take control of the shipment or parts of the shipment.[8]

We find no error in the decision of the district court in refusing to give the public authority defense instruction and we find that the entrapment by estoppel instruction was the proper instruction as to Pitt. However, Strube, who had no contact with Bowers or Mohle prior to his involvement with the shipments of the cocaine from Los Angeles to New York was not entitled to a similar instruction. The assurances of Pitt, his partner in crime, do not rise to the level of instructions, encouragement, or advice from a government official.

B. DENIAL OF PITT'S MOTION FOR ACQUITTAL BASED ON THE DEFENSE OF ENTRAPMENT BY ESTOPPEL

Pitt argues that it was error for the district court to deny his motion for acquittal because the prosecution failed to rebut his defense of entrapment by estoppel. Against that argument the Court is required to view the evidence and

_____

8. The requirement of pre-trial notice as to a defense based on government authority, alibi, and insanity entitles the government to be prepared for such a defense. Curiously, we find no requirement that a defense based on entrapment by estoppel be the subject of similar pre-trial notice and accompanying requirements. However, from a conceptual standpoint, we see little, if any, difference between the defense of apparent public authority and entrapment by estoppel. Since the issue of notice prior to use of the entrapment by estoppel defense has not been briefed, we see no need to rule definitively on that issue at this time.

inferences logically deduced therefrom in the light most favorable to the jury verdict. United States v. Pungitore, 910 F.2d 1084, 1128-29 (3d Cir. 1990), cert. denied, 500 U.S. 915 (1991).

United States v. Brebner, 951 F.2d 1017, 1025 (9th Cir. 1991) teaches that the entrapment by estoppel defense rests not on the defendant's state of mind, but on a due process theory that shifts the focus from the conduct of the defendant to the conduct of the government. Pitt argues that the facts, as developed in a light most favorable to the government, were not sufficient to contradict his defense of entrapment by estoppel. He points to the fact that he was under contract with Customs to work as a confidential informant; that the Customs agents were aware that Pitt would work on cases without a specific contract; and that they knew of his plan to import approximately 16,000 kilos of cocaine into the United States from Colombia.

Based on that combination of facts, Pitt argues that it could be inferred that he was authorized to engage in the preliminary transactions, i.e., the shipment of the 468 kilograms of cocaine from Los Angeles to New York City, to gain the confidence of the Colombian cartel. Such an argument justified the district court's submission of the defense of entrapment by estoppel, but is insufficient to support an acquittal as a matter of law.

The defense of entrapment by estoppel turns on credibility. The jurors apparently believed Customs Agents Bowers and Mohle when they testified that they did not know of Pitt's plan to distribute the three shipments of cocaine from Los Angeles to New York, nor had they authorized such conduct. Moreover, as indicated in the district court's summary cited earlier, Pitt clearly testified that no one authorized him directly or indirectly to commit the crimes for which he stands convicted.

The district court properly denied Pitt's post-verdict motion for an acquittal.

C. FAILURE TO DISMISS THE INDICTMENT AGAINST STRUBE FOR ALLEGED OUTRAGEOUS CONDUCT BY THE GOVERNMENT

Defendant Strube argues on appeal that, due to outrageous conduct by the government, it was error for the

11

district court to refuse to dismiss the indictment against him. Strube, unlike Pitt, did not testify. On appeal, through counsel, he appears to concede that he engaged in the charged conspiracy, but argues that from its inception through its planning, staffing, funding, implementation and direction, it was a creature of Richard Pitt, who was himself a creature of the United States Customs Service. While acknowledging the fact of a dispute between Pitt and the Customs agents as to whether they had authorized Pitt to move loads of drugs across the country in aid of the plan to use the Ridgely Warfield ship to transport the cocaine from Colombia to the United States, Strube argues that it is not in dispute that Pitt told his recruits to move loads of cocaine across the country, that Pitt told them that Customs had specifically authorized them to do this, and that the recruits, including Strube, had every reason to believe what Pitt told them and to do as instructed.

Strube advances the proposition that the government action by Bowers and Mohle in overseeing the Pitt operation with the goal of eventual use of the Ridgely Warfield to make a huge drug bust aimed at discouraging the continued importation of cocaine by a Colombian cartel, should require under due process principles a dismissal of his prosecution. To achieve that desired result, Strube alleges that the conduct of Bowers and Mohle in their oversight of Pitt constituted "outrageous government conduct."

The government argues that Strube failed to raise this defense at trial and, therefore, it should be considered waived and Strube should be precluded from raising the issue on appeal.

The defense of outrageous government conduct examines whether a defendant's due process rights have been violated because the government created the crime for the sole purpose of obtaining a conviction. It emerged from dicta in United States v. Russell, 411 U.S. 423 (1973), where the Court determined that the entrapment defense was not available to the defendant because he was predisposed to committing the crime, but went on to state that some day there may be a due process defense based upon outrageous government conduct. Id. at 431. Then, in

12

United States v. Hampton, 425 U.S. 484 (1976), the Court upheld Hampton's conviction, thereby limiting the defense.9 Although the conviction was upheld by a majority of five, the concurrence of Justices Powell and Blackmun demonstrated their hesitancy to foreclose the existence of a due process challenge.

United States v. Nunez–Rios, 622 F.2d 1093 (2d Cir. 1980) teaches that the defense of outrageous government conduct is based on an alleged defect in the institution of the prosecution itself and, as a consequence, is covered by the provisions of Fed. R. Crim. P. 12(b) which requires that a defendant raise in a pretrial motion: (1) defenses and objections based on defects in the institution of the prosecution; or (2) defenses and objections based on defects in the indictment or information. Since Nunez–Rios did not raise the issue of outrageous government conduct prior to trial, the court held he had waived the right to assert the defense on appeal. Id. at 1099. It is well established that the issue of outrageous government conduct is for the court, and not the jury, to resolve. Id. at 1098. See also United States v. Nolan–Cooper, 155 F.3d 221, 234 (3d Cir. 1998). As a consequence, the necessity for the pretrial motion to dismiss is obvious unless the evidence supporting the claim of outrageous government conduct is not known to the defendant prior to trial.

This Circuit addressed failure to plead the defense in United States v. Gonzales, 927 F.2d 139 (3d Cir. 1991). In that case, a drug transaction was initiated by an informant. A government agent was the seller and the defendant was a buyer. After his conviction, defendant argued that the contingency fee arrangement between the informant and the government constituted outrageous governmental conduct. The Court examined the procedural requirement outlined in Nunez–Rios, supra, but declined to apply a procedural bar under the facts of that case because defense counsel did not receive relevant information until the eve of

_____

9. In Hampton, a government informant supplied the defendant with the heroin he sold to an undercover government agent. The defendant stated that the government's conduct of being both the supplier and buyer violated his due process rights.

13

trial, making compliance with the procedural requirement virtually impossible. The Court then evaluated the case based upon a plain error standard and determined that the conduct was not outrageous.10

Strube did not raise the defense of outrageous government conduct in a pretrial motion, and he has provided no good explanation for failing to do so. Unlike the defendant in Gonzales, Strube did not discover facts about government involvement shortly before his trial. Rather, Strube's main defense at trial was that he was authorized by a government agent to commit his illegal actions. Therefore, Strube was always aware of the facts upon which he now claims this defense. Since Strube offers no reason for his failure to raise the defense at trial, the Court need not make an exception to his waiver. See, United States v. Coppola, 526 F.2d 764, 773 (10th Cir. 1975) (refusing to grant an exception to waiver on appeal because the defendant had two years to raise the defense, he failed to demonstrate good cause for non-compliance with Rule 12(b), and he failed to show any prejudice from the waiver).

Even if Strube had properly raised this defense, it would fail. Strube claims his case parallels United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), because the government "created, staffed, directed and implemented a criminal enterprise which would not have otherwise existed." (Strube's Op. Br. at 36). In Twigg, the Court addressed charges of drug production where the government provided chemical components, glassware, expertise and a location. Without that assistance, the defendants would not have had the ability to produce the drug.11   Strube argues that,

_____

10. The informant in Gonzales had a contingency fee arrangement with the government that was not fully disclosed until the Friday before a Monday trial. The informant and the government had set up a "reverse sting" and the defendant was convicted of drug charges.

11. Strube fails to recognize that, since Twigg, this Court has used extreme caution in finding due process violations in undercover settings. United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir.), cert. denied, 519 U.S. 1047 (1996). See also, United States v. Nolan-Cooper, 155 F.3d 221, 229-30 (3d Cir. 1998) (continuing to recognize the existence of the defense but observing the hesitancy of the judiciary to uphold due

14

as in Twigg, the government created the crime through its agents, Pitt, Bowers and Mohle.

Assuming, arguendo, that Pitt was an agent of Customs acting with its authority, Strube's defense would still fail. There are significant factual differences between the cases Strube cites and his case. In previous cases, courts have determined that, in order for the claim of outrageous government conduct to succeed, a government agent has to initiate the criminal conduct with the goal of obtaining a conviction and must draw the defendant into the illegal activity to bring about that goal. See, United States v. West, 511 F.2d 1083 (3d Cir. 1975) (reversing conviction because agent contacted defendant, who had no criminal record, and supplied him with drugs defendant sold to another agent);12 Twigg, supra (reversing conviction because informant contacted defendants and initiated drug production to get them convicted); Nolan-Cooper, supra (emphasizing defendant's ongoing involvement in criminal activity before agent approached her); United States v. Gardner, 658 F. Supp. 1573 (W.D. Pa. 1987) (reversing conviction because informant pursued defendant even after defendant refused to find cocaine for him and tried to give informant's money back).13 In this case, various Colombian

_____

process violation claims); United States v. Gambino, 788 F.2d 938, 945 n.6 (3d Cir.), cert. denied, 479 U.S. 825 (1986) (same). See also, United States v. Jannotti, 673 F.2d 578 (3d Cir.), cert. denied, 457 U.S. 1106 (1982); United States v. Beverly, 723 F.2d 11 (3d Cir. 1983); United States v. DeRewal, 10 F.3d 100 (3d Cir. 1993), cert. denied, 511 U.S. 1033 (1994) (all calling Twigg into doubt).

12. Called into doubt by United States v. Beverly, 723 F.2d 11,12 (3d Cir. 1983).

13. See also, Greene v. United States, 454 F.2d 783 (9th Cir. 1971) (reversing bootleggers' convictions because they had ceased criminal activity until an agent contacted them and provided supplies for production); United States v. Batres-Santolino, 521 F. Supp. 744 (N.D. Cal. 1981) (reversing conviction because informant induced defendants into cocaine deal so his DEA friends could arrest them; defendants lacked prior criminal involvement and wanted to back out); United States v. Mosely, 965 F.2d 906 (10th Cir. 1992) (upholding conviction even though seller was a government agent); United States v. Pedraza, 27 F.3d 1515 (10th Cir.) (upholding the conviction because defendants originally contacted the undercover agent rather than being induced into criminal activity), cert. denied, 513 U.S. 941 (1994).

drug cartels were the target for criminal prosecution. So while this operation was intended to secure a conviction, it was not the conviction of Strube. The defense of outrageous government conduct is not applicable.

Even if the operation had been orchestrated to convict Strube, the conduct would still not rise to the level of violating Strube's right to due process. To meet that standard, the challenged conduct must be shocking, outrageous, and clearly intolerable. Mosely, 965 F.2d at 910. It must violate our sense of fundamental fairness or shock the universal sense of justice. Russell, 411 U.S. at 432. There is nothing so shocking here.

In sum, Strube waived the issue of outrageous government conduct by failing to move to dismiss prior to trial. In any event, the claim of outrageous government conduct is totally lacking in merit.

D. THE POST-CONVICTION CHALLENGE TO THE LACK
OF VENUE

Both Pitt and Strube argue that the government failed to meet its burden of proving the venue of the alleged offenses. Neither defendant challenged the absence of venue until after their convictions. The government asserts that the proof established venue. We need not address the issue of venue in this case given the time of the initial objection. United States v. Robinson, 167 F.3d 824, 829 (3d Cir. 1999)[14] is dispositive in its holding that the issue of improper venue, at the very latest, must be raised in every possible scenario before the jury reaches its verdict.

E. ADMISSION OF TAPE RECORDINGS BY STRUBE
ALLEGEDLY RELATED TO SUBSEQUENT UNCHARGED
NARCOTICS TRANSACTIONS

Over objection, the district court permitted the government to introduce the May 22, 1995 recorded conversation between Strube and George Morales, a government informant. The conversation was nine months after the intercepted third shipment of cocaine. [15] It is

_____

14. A petition for certiorari was filed on June 4, 1999 (No. 98-9669).

15. A transcript of the audio tape is found in the Supplemental Appendix. (S.A. at 12-18).

16

apparent from a reading of the conversation that the jury could find that Strube is discussing cocaine and, by inference, his involvement in the first shipment of 150 kilograms of cocaine. The district court found the statement admissible against the background of the defense anchored in public authority. To the extent the statements of Strube alluded to subsequent cocaine transactions, they were admissible under the teachings of Fed. R. Evid. 404(b) on the issue of intention. We find no error.

F. SUFFICIENCY OF EVIDENCE OF CONSPIRACY TO
LAUNDER DRUG TRAFFICKING PROCEEDS

United States v. Reed, 77 F.3d 139, 142 (6th Cir.), cert. denied, 517 U.S. 1246 (1996), teaches that mere transportation of drug proceeds is insufficient proof of a violation of 18 U.S.C. SS 1956 (a)(1)(A)(i) and (a)(2) for laundering drug trafficking proceeds. However, the evidence viewed in a light most favorable to the government demonstrates that in excess of $1 million in drug trafficking proceeds was collected in New York and transported, either to Colombia, South America or to Pennsylvania. The proceeds were used by both Pitt and Strube to pay individuals like Wallace Pitt and others for their assistance in flying and driving the cocaine across the country. The monies were also used to pay the credit card bills of Pitt which included travel charges related to his drug trafficking activities. We find the claim of insufficient evidence as to the laundering of the drug trafficking proceeds to be without merit.

G. DENIAL OF STRUBE'S MOTION FOR A MISTRIAL

At closing argument, in response to a defense claim that the government had strong-armed its witness, Wallace Pitt, into a guilty plea, the government countered with the following statement:

> I will be brief. There has been a lot of speculation as to why some people are here and some aren't. I could spend a whole lot of time explaining to you all of that, but it's not important. Because what the Judge is going to instruct you is you have to consider whether these men did these acts, not why or what happened to everybody else.

17

But you do know some of that. I think it has been
slightly misportrayed to you. Wally Pitt wasn't beaten
into submission. Wally Pitt is a man. He admitted that
he did something wrong. He realized after the fact that
when you take 150 kilos across the country even
though your brother lied to you -- [Defense objection].

(J.A. at 1357).

Strube's counsel moved for a mistrial on the basis that
this statement by the government constituted an
impermissible reference to the fact that Strube had not
testified.

We find no error in the denial of the motion. We find the
statement to come within the "invited reply" doctrine
enunciated in United States v. Young, 470 U.S. 1, 11
(1985). In any event, the district court gave a curative
instruction.16

_____

16. The district court's jury charge included the following instruction:

   If you find that any government witness was an accomplice to the
   commission of the crimes involved in this indictment, you should
   consider such testimony with greater caution than that of a witness
   who is not an accomplice.

   You should also consider the extent to which such testimony may
   have been influenced by the hope or expectation of favorable
   treatment from law enforcement authorities.

   Now you have heard testimony from government witnesses who
   have pled guilty to charges arising out of the same facts in this
case.
   You are instructed that you are to draw no conclusions or inference
   of any kind about the guilt of these defendants on trial from the
fact
   that a prosecution witness pled guilty to similar charges.

   That witness's decision to plead guilty was a personal decision
   about his own guilt. It may not be used by you in any way as
   evidence against or unfavorable to the defendants on trial here.

   By that very fact, ladies and gentlemen, you may not draw any
   adverse inference to any defendant in this case who has not
   testified.

   Mr. Strube did not testify in this case. A defendant in a criminal
   case has the absolute right under our constitution not to testify.
The
   fact that defendant Strube did not testify must not be discussed or

considered by you in any way when deliberating or in arriving at your verdict. No inference of any kind may be drawn from the fact that Mr. Strube decided to exercise his privilege under the constitution not to testify.

18

H. THE TWO-LEVEL ENHANCEMENT OF STRUBE'S
OFFENSE LEVEL FOR POSSESSION OF A FIREARM

The district court found the total offense level for Strube
to be 41 with a criminal history of III providing for a
sentencing range of 360 months to life. Strube received a
sentence of 360 months in contrast to the life sentence
imposed on Pitt. The total offense level included a two level
enhancement for the .357 caliber revolver displayed to
Wallace Pitt.

The district court addressed the issue of weapon
enhancement at the sentencing hearing as follows:

> Good morning. The Court will address the objections
> that have been filed. The first objection was to the
> enhancement for firearms possessions.
>
> I am fully aware of the defendant's argument. As I
> review the evidence, there was a delivery of cocaine at
> the residence of the defendant, and that Wallace Pitt
> was present at Mr. Strube's residence and was escorted
> through the house and shown the firearms.
>
> As I recall, was not Wallace Pitt a collector himself?
>
> [By counsel]: I believe that he had a firearms license,
> yes, Your Honor.
>
> [The Court]: But in any event, he recalled only a few of
> those being antique items or collector items and that
> the balance were operable weapons. And I believe that
> under the U.S. Sentencing Guidelines that those facts
> support an enhancement.

(J.A. at 1520).

The district judge permitted counsel to make their
respective arguments regarding the objection to thefirearm
enhancement and then concluded:

> . . . With regard to the objections, I believe that there
> is sufficient argument made by the defendants as to
> the role in the offense and will delete that two point
> enhancement.
>
> In all other respects, the Court adopts the factual
> findings and the guideline application as set forth in

19

the first and second addendum to the presentence report in support of the enhancements.

(J.A. at 1543). The Presentence Report, describing the offense conduct, stated that Wallace Pitt, half-brother of Strube's co-defendant, Richard Pitt, drove a quantity of cocaine from Utah to Strube's home in Pennsylvania, where he met up with Richard Pitt, who had flown another quantity of cocaine from Utah to Pennsylvania. The report continues:

> Wallace Pitt told investigators that Mr. Strube took the bags of cocaine from his car and later took him on a tour of his house. Wallace Pitt said the defendant [Strube] showed him several firearms including a .357 caliber revolver. While at the defendant's house, Richard Pitt paid Wallace Pitt $5,000.

"We review the district court's factual findings in relation to sentencing issues for clear error." United States v. Felton, 55 F.3d 861, 864 (3d Cir. 1995) (citing United States v. Fields, 39 F.3d 439, 447 (3d Cir. 1994)); United States v. Miele, 989 F.2d 659, 663 (3d Cir. 1993); United States v. Belletiere, 971 F.2d 961, 964 (3d Cir. 1992))."Our review with respect to the court's application and interpretation of the Sentencing Guidelines is plenary." Felton, 55 F.3d at 864 (citing cases).

Application note 3 to USSG S2D1.1 states that

> . . . The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. . . .

In United States v. Price, 13 F.3d 711, 734 (3d Cir.), cert. denied, 514 U.S. 1023 (1995), this Court noted that "it was the risk of violence caused by the combination offirearms and drugs that merited an increase in sentence."

Although the district court here made no actualfindings on the record, the court's statements quoted above implicitly recognize that the weapons shown to Wallace Pitt were "connected with the offense" and were certainly intended to indicate a potential for violence. It takes no

20

imagination whatsoever to conclude that Strube displayed his weapons to Pitt, not so Pitt, the gun collector, could admire them, but so Pitt, the drug courier, would clearly understand that Strube was never to be crossed. As this Court has concluded: "[the defendant's] `arsenal' created a strong inference that he possessed these weapons in order to further the drug transaction." United States v. Demes, 941 F.2d 220, 223 (3d Cir.), cert. denied, 502 U.S. 949 (1991).

We find no error in the enhancement for possession of a weapon.

## I. THE SUA SPONTE MOLDING OF THE JURY'S SPECIAL FORFEITURE VERDICT

Count V of the Indictment sought the forfeiture of property owned by Strube in Columbia, Pennsylvania and also $1,081,400.00 in U.S. currency, pursuant to provisions of 21 U.S.C. S 853(a) and 18 U.S.C.S 982(a)(1).

The jury returned a special verdict forfeiting $826,400.00 in U.S. currency from Pitt and an additional $255,000.00 in currency from Strube along with the Strube residence. Thereafter, the district court entered a judgment with joint and several liability against both Pitt and Strube for the total forfeited sum of $1,081,400.00. Strube challenges the molding of the verdict as contrary to his right to have the jury determine the issue and amount of forfeiture. The government, building on the conviction of both Pitt and Strube on Count IV, the money laundering count, interprets the jury findings of the two sums of $826,400 and $255,000 as its determination that the entire sum the government sought to forfeit, $1,081,400, was involved in the money laundering offense and was therefore forfeitable under a joint responsibility analysis.

Fed. R. Crim. P. 31(e) provides that a special verdict shall be returned by the jury as to the extent of the interest or property subject to forfeiture where the indictment alleges such interest or property are subject to criminal forfeiture. Strube contends that the district court erred in molding the verdict to impose a forfeiture upon him in the sum of $1,081,400 rather than the sum of $255,000 set forth in the jury's verdict.

21

Congress has provided that, in imposing sentence on a person convicted of, among other things, an offense in violation of the money laundering statute, 18 U.S.C.S 1956, a court "shall order that the person forfeit to the United States any property . . . involved in such offense." 18 U.S.C. S 982(a)(1). Pitt and Strube were both convicted as co-conspirators under S 1956(h) (Count IV of the indictment). We interpret S 982(a)(1) as imposing a rule of joint and several liability in the case of a money laundering conspiracy. The statute does not say that each conspirator shall forfeit only such property involved in the offense which is or has ever been in that conspirator's possession. Rather, the statute recognizes that the amount of property involved in a money laundering conspiracy cannot be different for different conspirators.

In view of the above discussion, there is no need to reach 21 U.S.C. S 853(a)(1); however, it leads to the same conclusion with respect to forfeiture of property involved in drug-related crimes. Section 853(a)(1) provides for the forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of [a qualifying drug offense]." 17 In imposing sentence on such person, the court "shall order[ ] . . . that the person forfeit to the United States all property described in this subsection." 21 U.S.C. S 853(a)(1) (emphasis added). Like 18 U.S.C. S 982(a)(1), 21 U.S.C. S 853(a)(1) imposes joint and several liability with respect to forfeiture. See United States v. McHan, 101 F.3d 1027, 1043 (4th Cir. 1996) (concluding that S 853(a)(1) "is not limited to property that the defendant acquired individually but includes all property that the defendant derived indirectly from those who acted in concert with him in furthering the criminal enterprise"), cert. denied, 520 U.S. 1281 (1997).18

_____

17. Included among such offenses are those set forth in 21 U.S.C. SS 841 and 846. Section 841(a)(1) makes it unlawful for any person to knowingly or intentionally distribute a controlled substance. Section 846 makes it unlawful for a person to conspire to distribute a controlled substance. Pitt and Strube were both convicted of such offenses.

18. McHan also points to cases involving the RICO forfeiture statute, where "courts have unanimously concluded that conspirators are jointly and severally liable for amounts received pursuant to their illicit agreement." McHan, 101 F.3d at 1043 (citing cases).

22

Thus, whether under 18 U.S.C. S 982(a)(1) or 21 U.S.C. S 853(a)(1), Pitt and Strube were liable in forfeiture for the full amount of cash received by the conspiracy. The jury's special verdicts can be harmonized by interpreting them to refer to the amount that each defendant personally received. It was, therefore, proper for the trial judge to harmonize the verdicts in this manner, to apply the strict rule of joint and several liability that governs under both forfeiture statutes, and to enter an appropriate judgment based on this understanding.

IV. CONCLUSION

Based on the foregoing analysis, the convictions and sentences of both appellants, Richard L. Pitt and William Michael Strube, are AFFIRMED.[19]

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

---

19. We reject without discussion the claim that the district court erred in refusing the requests of the defendants to play, in their entirety, 25 taped conversations between Pitt and the Customs Agents Bowers and Mohle, and the claim that the government failed to comply with both the Jencks Act and Brady v. Maryland, 373 U.S. 83 (1963), finding both claims to be without merit.