565 F.2d 286
 2 Fed. R. Evid. Serv. 785
 UNITED STATES of America, Appellee,
v.
James Wagner McCORMICK, Appellant (three cases).
UNITED STATES of America, Appellee,
v.
Percy Perrine CARTER, Appellant (three cases).
UNITED STATES of America, Appellee,
v.
Louis Martin WEINSTEIN, Appellant (two cases).
 Nos. 77-1330 to 77-1337.
 United States Court of Appeals,
Fourth Circuit.
 Argued Aug. 10, 1977.
Decided Nov. 11, 1977.
Certiorari Denied Jan. 9, 1978.
 
 See 98 S.Ct. 747.
 Stuart A. Saunders, Hampton, Va. (Saunders, Rogers & Saunders, Hampton, Va., on brief), for appellant in No. 77-1333 and No. 77-1336.
 Elwood H. Richardson, Jr., Hampton, Va., for appellant in Nos. 77-1330, 77-1332, and 77-1335.
 Malcolm Parks, III, Hampton, Va. (Maloney, Yeatts, Balfour, Ayers & Barr, Richmond, Va., on brief), for appellant in Nos. 77-1331, 77-1334, and 77-1337; Justin W. Williams, Asst. U. S. Atty., Alexandria, Va. (Roger T. Williams, Executive Asst. U. S. Atty., Norfolk, Va., and William B. Cummings, U. S. Atty., Alexandria, Va., on brief), for appellee in Nos. 77-1330 through 77-1337.
 Before RUSSELL, WIDENER and HALL, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 James Wagner McCormick, Percy Perrine Carter, and Louis Martin Weinstein appeal from their convictions of various drug-related offenses under Chapter 13, Title 21, of the United States Code. All appellants were convicted of two counts of conspiracy to distribute Schedule II controlled substances, one count each of cocaine and methamphetamine hydrochloride, in violation of 21 U.S.C. § 846. Additionally, McCormick and Carter were convicted of violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 by aiding and abetting the distribution of controlled substances, one count each for cocaine and methamphetamine hydrochloride. The three were tried together, Weinstein before a jury, while Carter and McCormick were tried to the district court. They present numerous issues for review.
 
 
 2
 On July 13, 1976, special agent Richard Broughton of the Drug Enforcement Administration (DEA) and a confidential informant met with defendant Louis Weinstein at a delicatessen, the Delly, in Hampton, Virginia. The informant introduced Broughton to Weinstein as the man who wanted "to cop the oz.," meaning to purchase an ounce of narcotics. Weinstein informed Broughton that defendant Percy Carter had been at the Delly, but now was at his residence waiting for Broughton and the informant. Broughton and the informant then went to Carter's residence, but soon all three returned to the Delly and met with Weinstein. Weinstein stated that he had been trying to reach "his man," but that so far he had been unsuccessful.
 
 
 3
 After a short stop at a pool hall near the Delly, all four men went to the informant's residence. Weinstein continued efforts to contact "his man," and during this time began to refer to him as "Jim." Carter assisted in the search by making telephone calls at Weinstein's direction. During this time, Weinstein suggested that Carter try a particular telephone number, stating that Jim sometimes could be found at that number. Testimony indicated that this telephone number belonged to defendant James McCormick's brother Jay. During the remainder of the evening's futile efforts to contact Weinstein's "man," Carter also began to refer to him as "Jim," and commented that Jim's mother ran a ceramic shop in the Tidewater Virginia area. McCormick's father owns a ceramic shop in Newport News. The purchase price of the cocaine was set (apparently with Carter) at $1400.
 
 
 4
 The next day, July 14, Broughton and the informant arranged to meet with Weinstein at a restaurant, but on arriving found Carter there instead. "Jim" still had not been talked to, and the three passed the time playing pool and listening to Carter's accounts of previous marihuana and cocaine transactions. Broughton, Carter, and the informant later met with Weinstein, and then returned to the informant's residence to wait for Weinstein to contact "Jim." Weinstein finally was successful, and early that evening Broughton, Carter, and the informant met with Weinstein at a pool hall near the delicatessen. Broughton and Weinstein went into a back room, where Broughton paid Weinstein $1400. Weinstein took the money, left the pool hall, and came under the surveillance of agent Stanley Burroughs of the DEA. Burroughs watched Weinstein enter an automobile parked immediately in front of the poolroom, and identified the driver of the auto as defendant James McCormick. McCormick and Weinstein drove to a nearby shopping center, where Burroughs observed Weinstein "handling something." After parking for about ten minutes, McCormick drove Weinstein back to the pool hall, and when Weinstein exited the car, Burroughs observed a "white object" in Weinstein's left hand.
 
 
 5
 While Weinstein and McCormick were together, Broughton became apprehensive that Weinstein might have stolen $1400. Carter, however, provided reassurance, and stated that he and Weinstein had been doing business with "Jim" for a long time, and that the dope would be good. On Weinstein's return, he gave a plastic bag containing white powder to Broughton, and provided advice on how the powder, which Weinstein said was cocaine and which chemical analysis later proved to be cocaine, could be cut.
 
 
 6
 Agent Broughton executed a second purchase on August 12, 1976. He met with Weinstein and Carter at the delicatessen, and at approximately 8:15 p. m., all three left for "Jim's house." They arrived at 2113 Cunningham Drive, part of an apartment complex in Norfolk. Broughton gave Weinstein $2700 for the purchase of two ounces of cocaine, and Weinstein entered the complex at No. 2113. After some delay, Broughton became worried that Weinstein had stolen the money, and despite assurances from Carter that business had been done this way for years, Broughton and Carter conducted an unsuccessful search. Carter stated that Jim lived with his girl friend in the complex, but that he could not remember which apartment because the only time he had been there he had been drunk. Broughton later saw Weinstein returning through the foyer of 2113 Cunningham.[1]
 
 
 7
 Carter, Weinstein, and Broughton then returned to the car, where Weinstein gave Broughton a package of tan powder and $100 in change. At this time, Carter asked for "some cash for my time in setting up the deal," and Broughton gave him twenty dollars. Later that night, Broughton and other DEA agents field-tested the purchase. They discovered that the drug was not cocaine, but possibly an amphetamine,[2] and that Weinstein had shortchanged Broughton by selling only an ounce and a half, not the two ounces bargained for.
 
 
 8
 The next day, Broughton confronted Weinstein with these discrepancies. Weinstein responded that the drug was a combination of cocaine and amphetamine,[3] and that a half-ounce had been kept out of the package for the informant. At Broughton's insistence, he and Weinstein retrieved the missing quantity of drugs from Carter's residence. Weinstein reported that Carter had picked up the drug at "Jim's" apartment, but gave no reason for his failure to tell Broughton about the missing half-ounce.
 
 
 9
 The final drug transaction occurred on September 30, 1976. Pursuant to previous arrangements Broughton had made with Weinstein, the two men met at the Delly to consummate the sale. The terms of the purchase were three ounces of cocaine for $4000. Weinstein demanded the money "up front," as in the previous two transactions, but Broughton demurred because of the missing half-ounce from the previous transaction. Weinstein argued, but eventually agreed "to see if he could work it out with his man."
 
 
 10
 McCormick arrived at the Delly, and met with Weinstein. The two went to McCormick's car, and then Weinstein returned to the Delly. A short time later, Weinstein and Broughton left the Delly for Broughton's auto. As they passed McCormick's car, Weinstein pointed to it and said "That's my man sitting in the brown Dodge over there." After Broughton took the cocaine from Weinstein, the agents arrested all three defendants. A search incident to Weinstein's arrest produced another package of cocaine and a marihuana cigarette, and while he and McCormick were being transported to the Portsmouth City Jail, McCormick volunteered the statement that "I know I did wrong. I'm just going to serve my time."[4]
 
 
 11
 All three defendants object to the length of the prison sentences imposed by the district court for conspiracy to sell methamphetamine hydrochloride. McCormick and Weinstein received fifteen-year sentences on this count, while Carter was sentenced to nine years. Their objection is well taken. The statutory maximum for a non-narcotic Schedule II drug, which includes methamphetamine hydrochloride, is five years, plus a fine. 21 U.S.C. §§ 841(b) (1), 846; 21 C.F.R. § 1308.12(d). Their sentences on this account are vacated and the case remanded to the district court for resentencing.
 
 
 12
 Weinstein contests only the constitutionality of Congress' action, in 21 U.S.C. § 802, in declaring cocaine to be a narcotic drug, in light of evidence that pharmacologically cocaine is a stimulant. We are of opinion this assertion is without merit. E. g., United States v. Harper, 530 F.2d 828 (9th Cir. 1976).
 
 
 13
 McCormick's principal assignment of error is that the trial court erroneously admitted declarations by his co-conspirators, made during the course and in furtherance of the conspiracy, because there was no independent evidence of his role in the conspiracy. McCormick is correct in stating that there must be independent evidence of his participation in and the conspiracy itself to permit admission into evidence against him of declarations made by co-conspirators. E. g., United States v. Stroupe, 538 F.2d 1063 (4th Cir. 1976). Without independent evidence, the conspiracy exception of Fed.R.Evid. 801(d)(2) (E) is not applicable. See Joyner v. United States, 547 F.2d 1199, 1203 (4th Cir. 1977).
 
 
 14
 There is, however, adequate independent evidence of McCormick's role in the conspiracy. As earlier related, at the time of the first drug transaction agent Burroughs observed Weinstein leave the pool hall and enter an automobile driven by McCormick. He further observed the two drive to a nearby shopping center, spend approximately ten minutes during which McCormick watched Weinstein "handling something," and then return to the pool hall. The drugs in the second transaction came through the normal entrance to McCormick's abode. During the final transaction, Burroughs observed Weinstein again meet with McCormick and go to McCormick's car immediately before the exchange with Broughton. This direct evidence, contemporaneous with the drug transactions, suffices to establish the requisite independent evidence, and the declarations of McCormick's co-conspirators were thus admissible against him.[5]
 
 
 15
 McCormick further complains that the trial court erred in admitting evidence of statements by co-conspirators to prove the substantive offenses of aiding and abetting the distribution of cocaine and methamphetamine hydrochloride. This contention is without merit. United States v. Jones, 542 F.2d 186, 202, n. 31 (4th Cir. 1976). We have considered McCormick's remaining assignments of error and conclude that they also are without merit.
 
 
 16
 Carter's assignments of error relate to the admissibility of co-conspirator's statements, and the sufficiency of the evidence to support his convictions of conspiracy to distribute controlled substances and aiding and abetting their distribution. As with McCormick, we consider whether the government provided the requisite independent evidence of Carter's role in the conspiracy and hold that it did. Agent Broughton testified that Carter made telephone calls at Weinstein's direction during the initial attempts to contact "Jim." Broughton, on request, also paid Carter $20 at the time of the second transaction for Carter's "time in setting up the deal." Finally, Carter continually encouraged Broughton during the less certain aspects of the transactions by assuring him that all was well, that business had been done that way for years, and the dope would be good. This evidence not only established Carter's role in the conspiracy, but, together with the remainder of the evidence, permitted the district court to find him guilty beyond reasonable doubt of both the conspiracy and substantive offenses.
 
 
 17
 We thus affirm the convictions of all appellants, vacating and remanding for resentencing only, as previously stated, the sentences for conspiracy to distribute methamphetamine hydrochloride in cases Nos. 77-1334, 1335, and 1336.
 
 
 18
 AFFIRMED IN PART, VACATED IN PART, and REMANDED.
 
 
 
 [1]
 The shortest and easiest access to 2115 Cunningham was through the foyer of 2113 Cunningham. The two buildings were part of the same apartment complex, and McCormick lived in 2115 with his girl friend, Jane Majewski. The automobile driven by McCormick during the July 14 transaction was a rental car leased to a "J. McCormick," payment for which was guaranteed by a credit card belonging to Jane Majewski. In addition, when McCormick was arrested, he was driving an automobile registered to Jane Majewski of 2115 Cunningham Drive
 
 
 [2]
 The drug proved to be methamphetamine hydrochloride
 
 
 [3]
 Weinstein referred to the amphetamine as "speed."
 
 
 [4]
 McCormick's statement was clearly admissible. He made the statement after he had been apprised of his rights and during a conversation between agent Burroughs and defendant Weinstein. The government agent did not solicit McCormick's statement. Accordingly, McCormick's objection to the admissibility of his statement is without merit
 
 
 [5]
 A district court may, in its discretion, admit the statements of co-conspirators prior to proof of the conspiracy, "since the judge may, in his discretion, permit the introduction of evidence as to things said and done by an alleged co-conspirator subject to being connected up and followed by evidence of the existence of the conspiracy." United States v. Vaught, 485 F.2d 320, 323 (4th Cir. 1973)