**UNITED STATES of America, Appellee,**

v.

**Jonathan Paul KELLY, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**John Mansfield HARRIS, Sr., Appellant.**

**Nos. 82–5167(L), 82–5168.**

United States Court of Appeals, Fourth Circuit.

Argued March 11, 1983.

Decided Oct. 5, 1983.

**662**

Stanley E. Speckhard, Greensboro, N.C. (Elreta M. Alexander Ralston, Donald K. Speckhard, Greensboro, N.C., on brief), for appellant John Mansfield Harris, Sr.

Robert S. Cahoon, Greensboro, N.C., for appellant Jonathan Paul Kelly.

David B. Smith, Asst. U.S. Atty., Greensboro, N.C. (Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., Becky M. Strickland, Paralegal Specialist on brief), for appellee.

Before MURNAGHAN and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

SPROUSE, Circuit Judge:

Jonathan Paul Kelly and John Mansfield Harris, Sr. appeal from their convictions for conspiring to distribute dilaudid, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. They contend that there was insufficient evidence, independent of the hearsay statements of coconspirator Kelly, to establish the existence of the conspiracy. Kelly also contends that the trial court erred in excluding as hearsay his testimony concerning his alleged conversation with a government informant, thus prohibiting him from proving that he was acting as a voluntary assistant to the informant involved in the investigation of Harris. We disagree with these contentions and affirm the trial court's denial of defendants' motions for acquittal.

Prior to their arrests, defendants worked in different used car businesses in High Point, North Carolina. Defendant Harris bought and sold used cars, and often dealt with defendant Kelly, who worked as the used car sales manager at Vann York Pontiac.

The principal events leading to the arrests of the defendants occurred during a two-day period in December, 1981. In the early afternoon of December 21, undercover agent Stanley Persinger of the Drug Enforcement Administration (DEA) directed DEA informant, George Ray, to place a telephone call to Kelly. Immediately following the call, Persinger and Ray went to Vann York Pontiac for a meeting with Kelly. When the two arrived at the dealership, Persinger observed Harris and Kelly inside the latter's office. Kelly left Harris to greet Ray and Persinger, and Ray then introduced the agent to Kelly under the alias "Joe Price." During the course of their conversation, Kelly informed Persinger that he would sell him 1,040 tablets of dilaudid for $15,600. When Persinger stated that he only wanted 40 or 50 tablets, Kelly explained that he would have to "check on that" and walked back to his office to talk to Harris. On returning, Kelly stated that "he doesn't want to do that, he wants to do the whole thing, and he'll be ready to do it tomorrow at 10:00 a.m." They then discussed how the transaction would occur if Persinger could come up with the necessary money.

Later that day, Persinger talked to Kelly twice by telephone. During the first call, in which Persinger stated that he had obtained two-thirds of the necessary money and would try to get the remainder by the next day, Kelly asked the agent to call again later because he was expecting an important call. During the second call, Kelly told the agent that "he" had not called yet and that they would have to resume their discussion the following morning.

The next day, December 22, Kelly told Persinger by telephone that he had not heard anything from "him" yet, but that "he" would be at Vann York around 10:00 a.m., and Persinger should call back then. When Persinger telephoned Kelly around 10:20 a.m., Kelly stated that "he" was there

and that everything was fine. On arriving at Vann York two hours later, however, Persinger was told by Kelly that "he" had left in an AMC Pacer with the dilaudid and would return shortly. When after a few hours the car had not returned, Kelly stated: "Let me see if he's at his house." He then called a telephone operator and asked for Harris' number, dialed a number, and told the agent that "he" was not home. Persinger eventually left Vann York, but returned to the dealership later that day around 2:50 p.m., after learning from Kelly that "he" had arrived.

Testimony by DEA and North Carolina law enforcement agents surveilling Vann York Pontiac on December 22, established that Harris arrived at the used car parking lot in an AMC Pacer at approximately 2:30 p.m. A few minutes later, Harris left the dealership offices and drove away in a red-and-white Pontiac. Harris returned shortly thereafter and parked by the AMC Pacer, which he entered on the passenger side. On exiting the Pacer, he was observed placing something into his coat pocket. Harris returned to the Pontiac, drove away, and returned within several minutes, whereupon he entered the dealership offices. Shortly thereafter, agent Persinger arrived and entered the dealership.

Kelly and Harris were seated in Kelly's office when Persinger entered the dealership, but Harris left the office as the agent walked into it. Kelly told the agent that the dilaudid was in the white car—pointing to a red-and-white Pontiac parked within view of the office window—and offered to sell the agent 944 tablets for $14,160. He showed the agent some paper with computations as to how he had arrived at that price. When Persinger explained that he could only buy 800 tablets, Kelly left the office and immediately conferred with Harris. On returning, Kelly agreed to the agent's terms, but emphasized that "he" wanted the money first. Shortly thereafter, Kelly and Harris were arrested. A search of the red-and-white Pontiac disclosed nine bottles of dilaudid containing 944 tablets. Following his arrest, Kelly told Persinger that he had participated in the negotiations in order to assist the government in apprehending Harris.

The defendants first contend that the trial court erroneously admitted out-of-court statements by Kelly because there was insufficient evidence, independent of the statements, to establish the existence of the conspiracy. Specifically, they argue that the court erred in admitting into evidence the recording of the December 21, telephone conversation between Kelly and informant Ray, recordings of four similar conversations between Kelly and Persinger, and the paper bearing Kelly's computations concerning the price of the dilaudid.

■ Federal Rule of Evidence 801(d)(2)(E) permits the admission into evidence of declarations made by a coconspirator during the course and in furtherance of the conspiracy, but requires independent evidence of the conspiracy itself, and of the defendant's participation in it, before the declarations of the coconspirator can be admitted against his cohort. *United States v. McCormick*, 565 F.2d 286, 289 (4th Cir.1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978). In order to invoke the rule, the government need not prove the conspiracy beyond a reasonable doubt, *United States v. Jones*, 542 F.2d 186, 203 (4th Cir.1976), but it must at least introduce "prima facie proof of the conspiracy," *United States v. Stroupe*, 538 F.2d 1063, 1065 (4th Cir.1976), (quoting *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir.1973)), or proof by a "fair preponderance" of independent evidence. *Id.* 538 F.2d at 1065 (quoting *United States v. Jones, supra,* 542 F.2d at 203).

■ The district court in the present case had adequate independent evidence of a conspiracy. Persinger testified that he twice observed Kelly and Harris conferring together during the two-day investigation, under circumstances strongly suggesting that they were discussing the proposed drug transaction. During Persinger's initial meeting with Kelly on December 21, the agent observed Kelly talking with Harris immediately after he had stated the terms

of his offer to Kelly. The following day, Persinger again observed Kelly conferring with Harris immediately after the agent had stated that he could only buy 800 dilaudid tablets.

Other events occurring on December 22 point to Harris and Kelly's involvement in a conspiracy. Two Vann York salesmen testified that they saw Harris at the used car lot around 10:00 a.m., the time when the person bringing the dilaudid was due to arrive. Persinger, who had waited unsuccessfully for the drugs to arrive at Vann York earlier in the afternoon, eventually returned to the dealership around 2:50 p.m. after hearing from Kelly that the person with the drugs had returned. Surveillance agents observed Harris arrive at Vann York in an AMC Pacer—the car in which the person with the drugs had purportedly left earlier that day—around 2:30 p.m. The agents later observed Harris place something in his pocket and enter a white-and-red Pontiac, the same car from which the dilaudid was seized. The agents seized 944 tablets of the drug, the exact amount quoted by Kelly in his second offer.

The existence of a conspiracy is further evidenced by several statements made by Kelly to Persinger. On both occasions that Persinger observed Kelly conferring with Harris, Kelly returned and stated to the agent how "he"—referring to someone other than himself—had reacted to the agent's terms. When Persinger initially arrived at Vann York on December 22, Kelly told the agent that "he" had left with the dilaudid in an AMC Pacer. Kelly later obtained Harris' telephone number after telling the agent that he would try to contact the person who had left in the AMC Pacer. ▮ The testimony attributing these statements to Kelly was not objected to at trial, but Harris now contends that it was hearsay which was erroneously admitted against him to establish the existence of a conspiracy. The answer to this argument is that Kelly's out-of-court statements were clearly admissible against himself as admissions against interest under Rule 801(d)(2)(A) of the Federal Rules of Evidence. *See* 4 Weinstein's Evidence ¶ 801(d)(2)(A)[1] at 801–138 (1981). These same statements were also admissible against co-defendant Harris, provided they were made during the course and in furtherance of a conspiracy, the existence of which was adequately established by independent evidence. Fed.R.Evid. 801 (d)(2)(E); *see also McCormick,* 565 F.2d at 289; *United States v. DiRodio,* 565 F.2d 573 (9th Cir.1977). Persinger's testimony of his personal contacts with Kelly, Harris' presence at the dealership during the anticipated transactions, coupled with the agents' surveillance of Harris, were direct evidence that a conspiracy existed and that both Harris and Kelly had participated in it. This evidence provided more than sufficient independent proof of a conspiracy to support the admission of Kelly's out-of-court statements against Harris. *See United States v. Stroupe,* 538 F.2d 1063 (4th Cir. 1976); *United States v. Jones,* 542 F.2d 186 (4th Cir.1976).

Kelly also contends that the trial court erred in prohibiting him from fully testifying that informant Ray enlisted him to cooperate with government investigators in apprehending Harris.[1] The trial court permitted Kelly to testify that he had discussions with Ray concerning Harris, dilaudid transactions, and about cooperating with Ray, but it prohibited him from recounting the contents of the conversations. The government argued and the trial court held, that any purported statement by Ray to Kelly was inadmissible hearsay. Kelly contends, however, that the evidence was admissible under Federal Rule of Evidence 803(3). This was the only theory of admissibility advanced at trial. Federal Rule of Evidence 803(3) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (3) *Then existing mental, emotional, or physical condition.* A statement of the

---

1. Ray was subpoenaed by the government for trial, but he could not be located.

declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) but not including a statement of memory or belief to prove the fact remembered or believed unless it related to the ... declarant's will ....

Kelly argues that if he indeed had acted at Ray's invitation, he could not have intended a criminal act regardless of whether Ray had the authority to submit such an invitation. He thus contends that Ray's conversation with him was admissible to prove absence of intent. Although not argued in appropriate terms either at trial or on appeal, the essence of Kelly's argument is that he acted on a mistake of fact—his belief that Ray had the requisite authority to enlist his assistance in apprehending Harris. If that were a mistake of fact, it possibly could have comprised a defense to the charge against Kelly. *See, e.g., Commonwealth v. Bollinger,* 197 Pa.Super. 492, 179 A.2d 253 (1962); *see generally* LaFave & Scott, *Criminal Law* § 47 (1972).

 If Kelly indeed acted on the basis of a mistake, however, it was a mistake of law, not a mistake of fact. Ray, as an informant, unlike a law enforcement agent, not only had no apparent legal authority, but there was no legal basis on which he could have enlisted Kelly in undercover activity with impunity. Kelly knew that Ray was at most an informant, not an agent or government employee. His alleged state of mind, then, was not a mistake of fact as to Ray's status, but resulted from a misconception of the legal prerogatives attached to that status. As a mistake of law, Kelly's alleged belief is no defense to his criminal act. *See United States v. Barker,* 546 F.2d 940, 946 (D.C.Cir.1976); *United States v. Barker,* 514 F.2d 208, 264 (D.C.Cir.1975); *see generally* Note, *Reliance on Apparent Authority as a Defense to Criminal Prosecution,* 77 Colum.L.Rev. 775 (1977). Moreover, even if Kelly's conception of Ray's authority was somehow considered a mistake of fact, under the circumstances of this case Kelly could not have "willfully and

blindly" relied on Ray's proffered authority. *See United States v. Jewell,* 532 F.2d 697 (9th Cir.1976), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *see also* Model Penal Code § 2.02(7) (Proposed Official Draft, 1962).

Quite apart, then, from the applicability of Rule 803(3), Kelly's proffered testimony was properly excluded because it was not relevant. Fed.R.Evid. 402.

We likewise find no merit to defendants' contention that the trial court erred in refusing to grant their motions for acquittal. Accordingly, the judgments of the district court are affirmed.

AFFIRMED.