**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ROSANNA SUE NICHOLS FULCHER,
a/k/a Rose Nichols, a/k/a Sue
Nichols, a/k/a R. S. Nichols, a/k/a
Rosanna Nichols, a/k/a Bo,
*Defendant-Appellant.*

No. 00-4167

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

ROSANNA SUE NICHOLS FULCHER,
a/k/a Rose Nichols, a/k/a Sue
Nichols, a/k/a R. S. Nichols, a/k/a
Rosanna Nichols, a/k/a Bo; MICHAEL
EDWARD FULCHER, a/k/a Michael
Ferguson; ETHEL VEST FULCHER,
a/k/a Zelda Vest, a/k/a O.C. Vest,
a/k/a Colin Vest, a/k/a Ann Smith,
*Defendants-Appellees.*

No. 00-4200

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

                v.                                   No. 00-4219

MICHAEL EDWARD FULCHER, a/k/a
Michael Ferguson,
                    *Defendant-Appellant.*

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CR-98-102)

Argued: March 1, 2001

Decided: May 17, 2001

Before NIEMEYER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Niemeyer and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Gerald Thomas Zerkin, GERALD T. ZERKIN & ASSO-
CIATES, Richmond, Virginia; Charles David Whaley, MOR-
CHOWER, LUXTON & WHALEY, Richmond, Virginia, for
Appellants. Joseph William Hooge Mott, Assistant United States
Attorney, Roanoke, Virginia, for Appellee. **ON BRIEF:** David P.
Baugh, Richmond, Virginia, for Appellant Ethel Fulcher. Robert P.
Crouch, Jr., United States Attorney, Roanoke, Virginia, for Appellee.

## OPINION

LUTTIG, Circuit Judge:

Defendants Ethel, Michael, and Rosanna Fulcher were convicted by a jury of various money laundering and drug violations. Following trial, a government agent wrote an *ex parte* letter to the district court explaining that he may have led the defendants to believe that they were authorized to conduct the entire operation on behalf of the government. The district court granted a new trial to the defendants pursuant to Fed. R. Crim. P. 33, holding that the newly discovered evidence satisfied every requisite element for a new trial. For the reasons that follow, we affirm.

I.

This case arises out of the pervasive presence of drugs at Bland Correctional Center ("BCC"), an institution operated by the Virginia Department of Corrections. The network of drug distribution at BCC was extensive, involving inmates, prison officials, and even the relatives and girlfriends of inmates. The drug operation managed by Michael Fulcher ("Michael") was no exception.

Michael purchased his supply of marijuana from various prison officials, including prison guards and counselors. J.A. 413-14, 538, 554-55. He would then divide the drugs he received into smaller quantities — most often teaspoon-sized servings — for distribution to inmates at BCC. J.A. 265, 773. Since his customers were prohibited from using cash while incarcerated, inmates purchased the drugs with money orders written on their inmate trust accounts, remitting payment to a number of individuals located outside the prison, including Rosanna Fulcher ("Rosanna"), Michael's wife, and Ethel Fulcher ("Ethel"), Michael's mother. J.A. 266-67, 557, 783-84, 1078. The funds collected would then be used to purchase additional marijuana from prison officials, beginning the cycle anew.

The appellants, Michael and Rosanna, were charged in a 47-count indictment — along with 22 other defendants — with engaging in drug and money laundering conspiracies, as well as substantive

counts of the same.[1] The jury convicted Rosanna of a money launder-
ing conspiracy and ten substantive counts of money laundering. J.A.
856-60. Michael was convicted of drug and money laundering con-
spiracies, a continuing criminal enterprise offense ("CCE"), and 17
substantive money laundering counts. J.A. 861-67.

On the eve of sentencing, the district court received an *ex parte* let-
ter from Special Agent Donald O. Lincoln, Jr., of the Drug Enforce-
ment Administration ("DEA"). J.A. 1074-79. In the letter, Lincoln
explained that he rejected Michael's request to formally investigate
the distribution of drugs at BCC for two reasons: (1) it would be
impossible to ensure his safety from other inmates and prison guards
while he was incarcerated; and (2) the amount of marijuana was "so
minuscule that I advised him that there was no way that we could jus-
tify a Federal investigation on what would at best be misdemeanor
level quantities." J.A. 1074.

Although Lincoln never formally granted permission for Michael
to initiate a formal drug investigation, Lincoln nonetheless stated his
concern that he, along with state law enforcement officers working
with the DEA, may have provided Michael with the mistaken impres-
sion that he had tacit approval to investigate drug dealing at BCC.
J.A. 1075. Specifically, Lincoln explained:

> It has come to my attention that in my absence Mr. Fulcher
> would periodically talk to Deputy Kenny Parker of the Bote-
> tourt County Sheriff's Office, who was working in the DEA
> Office, serving as a DEA Task Force Officer at that time. In
> these conversations Mr. Fulcher told Deputy Parker what he
> was working on. Deputy Parker, believing that the operation
> had already been approved by me, discussed a number of
> options with Mr. Fulcher. One of these involved arranging
> for one or more of the guards who were involved to make
> an attempted pickup of marijuana from Deputy Parker, in an
> undercover capacity, in Botetourt County. Under those cir-
> cumstances the case could have been taken to State Court in

---

[1]Ethel — who joins this case only to oppose the government's appeal
of the district court's grant of a new trial — was convicted of a money
laundering conspiracy and nine substantive counts of money laundering.

Botetourt or, if it developed into something interstate or substantial it could be brought to Federal Court. Deputy Parker discussed this potential operation with Sheriff Reed Kelly, and both of them recall the conversations. In addition Deputy Parker reminded me of a conversation he had with me concerning setting up a potential sting operation against a prison guard, to go down at a Botetourt County truck stop.

J.A. 1074-75. Lincoln also stated in the letter that during his numerous telephone conversations with Michael over a three-year period,

[t]here were indeed times when I was in a hurry to get him off the phone due to other commitments. If I said anything in haste which led him to believe he was "covered" it may be the proximate cause of all of this. I honestly do not recall ever saying anything to that effect, but if Task Force Agent Parker and Sheriff Kelly also believe that I did, then I must lend credibility to the possibility. I don't know what if any consideration can be given to all that I have related here, your Honor, but I felt it incumbent on me to state the facts as I now know them.

J.A. 1079.

On the basis of the letter, appellants filed a motion (which Ethel joined), asserting that they were entitled to a new trial on the basis of newly discovered evidence pursuant to Fed. R. Crim. P. 33. The district court held an evidentiary hearing, in which both Lincoln and Deputy Parker testified. Lincoln stated that David Fulcher, Michael's father, told him that Michael and Parker had spoken on several occasions concerning a possible sting operation. J.A. 927, 933, 935-36. According to Lincoln, Parker told him that he had talked with Michael several times regarding a possible drug operation, and that Parker had discussed a number of options with Michael about how to set up a sting operation involving prison officials. J.A. 936-39. On redirect, Lincoln acknowledged that, since his testimony at the pretrial hearing, his opinion regarding whether the Fulchers may have believed that they were authorized to conduct the operation had changed:

Q   All right. Now during your July testimony, June testi-
    mony [sic] in the courtroom, I asked you a question
    about, *"Did you ever do anything that in your estima-
    tion could have been construed as permission to con-
    duct this investigation?" And do you recollect your
    answer as being, "No"?*

A   *I probably did say that*, and I guess that's — . . .

Q   *Are you now of the opinion* that you could have been
    communicating to him and his mother that if the case
    was bigger it would be prosecuted and he could get his
    sentence reduced?

A   I don't know, but, yes, that's my primary concern at this
    point.

Q   Do you believe you might have?

A   *Yes. And if not me, then the fact that he talked to the
    other people in my office or to other people in my office
    [sic] and he felt that they somehow blessed it, then there
    is the very real possibility, especially from the part of
    Mrs. Fulcher.*

J.A. 984-85, 990-91 (emphases added).

On the basis of the letter and the testimony adduced at the eviden-
tiary hearing, the district court granted the motion for a new trial, hold-
ing that the newly discovered evidence was material because it was
directly related to the public authority defense[2] and to whether the
defendants possessed the requisite *mens rea* for their crimes. J.A.
1054, 1056-57. The district court also denied appellants' motions for
judgment of acquittal pursuant to Fed. R. Crim. P. 29. Appellants
filed a timely notice of appeal challenging their convictions, and the

---

[2]Only Michael and Ethel filed the requisite notices under Fed. R. Crim.
P. 12.3(a)(1) indicating that they would be relying on the public authority
defense. J.A. 75, 113.

government cross-appeals the district court's decision to grant a new trial.

## II.

The government argues on appeal that the district court erred in granting a new trial to defendants on the basis of newly discovered evidence.

Under Fed. R. Crim. P. 33, "[o]n a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require." In determining whether a new trial should be granted under Rule 33 for newly discovered evidence, this court utilizes a five-part test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States* v. *Custis*, 988 F.2d 1355, 1359 (4th Cir. 1989). Without ruling out the possibility that a rare example might exist, we have never allowed a new trial unless all five elements were established. *See United States* v. *Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995).

The district court made extensive findings on each of the elements of the *Custis* test and, of course, we review for an abuse of discretion the district court's decision to grant a new trial based on those findings. *Singh*, 54 F.3d at 1190. Under the abuse of discretion standard, "this Court may not substitute its judgment for that of the district court; rather, we must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *United States* v. *Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). Since the government challenges the district court's application of each of the *Custis* elements to the facts of this case, we review each in turn.

A.

The first element of *Custis* is whether the evidence is, "in fact, newly discovered." 988 F.2d at 1359. The district court held that Lincoln's letter was "newly discovered" since it mentioned new facts that added a "dimension to Lincoln's testimony that was not known before." J.A. 1055. We agree.

For instance, during the pre-trial motions hearing, Lincoln unequivocally testified that he did not say or do anything that could have been construed by Michael as permission to conduct an investigation at BCC under any circumstances, primarily due to concerns about Michael's safety while incarcerated. J.A. 231-32, 248-49. In contrast, at the post-trial evidentiary hearing, Lincoln testified that he and other members of his office might have communicated to Michael that if the case were bigger and involved a larger amount of drugs, the government might be interested in pursuing it further. J.A. 990-91; *see also* J.A. 1051-52 ("[N]ew to Lincoln's testimony is his assertion that, when first discussing with Michael the investigative work he had completed on the BCC marijuana ring, Michael told him that he had been trying to collect evidence the DEA might be more interested in by finding interstate connections and by working his way up the prison's chain of command."). As the district court found, the latter testimony "indicate[d] that Lincoln made statements to Michael and Ethel that he failed to tell this court about before the trial." J.A. 1051.

It is undisputed that this new testimony was not within the defendants' possession prior to or during trial, and that it only came to light when Lincoln himself — of his own accord — decided to write an *ex parte* letter to the district court on the eve of sentencing. Because the evidence contained in the letter and presented at the post-trial hearing was not discovered until after the trial, the district court did not abuse its discretion in holding that it constituted "newly discovered evidence." *Singh*, 54 F.3d at 1190 (stating that "newly discovered evidence" means "evidence discovered since the trial").

B.

The second element of *Custis* is whether there are facts alleged "from which the court may infer diligence on the part of the movant."

988 F.2d at 1359. The district court specifically found that "based on the substance and style of Lincoln's pre-trial testimony, any more specific questioning on this matter by the defendants would not have produced the same helpful evidence now before the court." J.A. 1052. The court reached that conclusion primarily because "Lincoln's pre-trial testimony was particularly unfavorable to the Fulchers by insisting that there was nothing ambiguous about his refusal to allow Michael to investigate the matter." J.A. 1053.

The district court's finding is amply supported by the record. The defendants engaged in a lengthy cross-examination of Lincoln during the pre-trial hearing, and as the district court correctly noted, there is simply no indication from the record that a more probing cross-examination would have elicited any of the facts that came to light following the trial. In fact, the record supports an inference to the contrary, since Lincoln stated in his letter that he "testified as truthfully and accurately as possible" at the pre-trial hearing and that any change in his testimony could be attributed, at least in part, to facts "coming to [his] attention" through his conversations with Deputy Parker and David Fulcher in the months following the hearing. J.A. 1074.

Therefore, we cannot say that the district court abused its discretion in concluding that there were facts from which it could infer due diligence on the part of the defendants.

## C.

The third element of *Custis* is whether the newly discovered evidence is "not [ ] merely cumulative or impeaching." 988 F.2d at 1359. The government contends that any newly discovered evidence is cumulative because the defendants could have testified regarding their own intent and, in particular, Michael could have testified about his conversations with Parker or Lincoln. We disagree for two reasons.

First, for evidence to be cumulative under Rule 33, it must be "additional evidence to that which was presented at trial as to a fact." *United States* v. *White*, 972 F.2d 16, 20 (2d Cir. 1992). The district court noted that "Michael and Ethel made a rational decision not to take the stand in part because they had no one to corroborate them on

this issue of intent." J.A. 1054. Because the jury did not hear any evidence at trial relating to defendants' intent or the public authority defense, the newly discovered evidence is not cumulative.

Second, evidence is only cumulative "when it adds very little to the probative force of the other evidence in the case so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial." *United States* v. *Williams*, 102 F.3d 320, 325 (7th Cir. 1996); *see also Elwood* v. *Pina*, 815 F.2d 173, 178 (1st Cir. 1994) ("Evidence is cumulative if repetitive, *and* if the small increment of probability it adds may not warrant the time spent in introducing it.") (quoting 1 Weinstein's Evidence ¶ 401[07] (1985)) (emphasis added). The district court, however, made a specific finding about the probative force of Lincoln's testimony — namely, that its addition would paint a "significantly more persuasive picture than the one presented to the jury at trial." J.A. 1054. Lincoln's testimony is more persuasive not only because he is a disinterested witness, but also because of his status as a DEA agent who was involved to some extent in the prosecution of this case. Therefore, the testimony of Agent Lincoln cannot be dismissed as cumulative since the probative force of his testimony at a new trial would be, according to the district court, significantly greater than the testimony of the defendants alone.

Thus, the district court did not abuse its discretion in holding that the newly discovered evidence is "not [ ] merely cumulative or impeaching."

## D.

The fourth element of *Custis* is whether the newly discovered evidence is "material to the issues involved." 988 F.2d at 1359. The government's principal argument on appeal is that the district court misapplied the defenses of public authority and mistake of fact and, in doing so, granted a new trial when the newly discovered evidence is not material.

At the post-trial evidentiary hearing, the following colloquy took place between Lincoln and Assistant United States Attorney Mott

regarding whether Lincoln had actual authority to authorize money laundering activities:

Q   If you were conducting a money laundering investigation, would you expect to document where the money went?

A   Yes. And first and foremost I would expect to have to get an attorney's general's exemption to do it.

Q   *And in a money laundering case you've got to go to the AG to get an exemption?*

A   *You have to go to the AG.* That's why I would never have authorized him to do that without permission.

J.A. 1000 (emphasis added). Lincoln further testified to the following when asked about his authority to authorize a drug operation of the type managed by Michael:

Q   And kind of a paramount rule in drug investigations is that you don't let the drugs walk?

A   Correct.

Q   And that means you would never allow Mr. Fulcher to sell marijuana to someone without recovering it very shortly thereafter?

A   That's correct.

Q   *You would never authorize him to conduct drug sales on behalf of the DEA?*

A   *That's true, and he knows that.*

J.A. 1000-01 (emphasis added).

On the basis of Lincoln's testimony, the government argues that Lincoln and his colleagues possessed, at most, apparent authority to

approve the operation undertaken by the Fulchers, and that such authority was insufficient to either negate intent or to support the defense of public authority. Though we agree with the legal arguments advanced by the government, we nonetheless conclude that there is insufficient evidence in the record regarding the extent of Lincoln's authority (or that of his colleagues at the DEA). Thus, we ultimately hold that the district court did not abuse its discretion when it concluded that the newly discovered evidence was material.

1.

The defendants first seek to introduce Lincoln's testimony for the purpose of negating criminal intent. "The defendant may allege that he lacked criminal intent because he honestly believed he was performing the otherwise-criminal acts in cooperation with the government. Innocent intent is not a defense *per se*, but a defense strategy aimed at negating the *mens rea* for the crime, an essential element of the prosecution's case." *United States* v. *Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994).

While an honest belief that a defendant is acting in cooperation with the government is a necessary element of establishing innocent intent, it is not alone sufficient. That is, evidence that defendants "honestly believed" that they acted in concert with a government official could abrogate the criminal intent necessary to prove the particular crimes with which the defendants were charged,[3] but, as we have recognized previously, any such abrogation *also* depends upon the nature of that official's authority.

---

[3]*See*, *e.g.*, 18 U.S.C. § 1956(a)(1) (substantive money laundering counts; requiring the government to prove that the defendant "*know[s] that* the property involved in a financial transaction represents the proceeds of some form of illegal activity") (emphasis added); *United States* v. *Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc) (conspiracy; requiring government to prove, *inter alia*, a defendant's connection to the conspiracy beyond a reasonable doubt including a knowledge element, which requires that a defendant at least have "join[ed] the conspiracy with *an understanding of the unlawful nature thereof* and willfully join[ed] in the plan on one occasion" (emphasis added)) (quoting *United States* v. *Roberts*, 881 F.2d 95, 101 (4th Cir. 1989)).

For instance, if a government official possessed *actual* authority to authorize the defendants' activity, then criminal intent certainly would be negated by the defendant's honest belief that he was cooperating with such an official. *See*, *e.g.*, *Baptista-Rodriguez*, 17 F.3d at 1368 n.18; *United States* v. *Duggan*, 743 F.2d 59, 83 (2d Cir. 1984). However, if the official possessed *neither* actual nor apparent authority to authorize the otherwise criminal activity, then criminal intent would not be negated. *See United States* v. *Kelly*, 718 F.2d 661, 665 (4th Cir. 1983).

The question most readily presented by Lincoln's testimony, and a question we have not heretofore addressed, is neither whether intent is negated when a defendant acts in concert with an official who does not possess either actual or apparent authority nor whether criminal intent is negated when a defendant acts in cooperation with an official with actual authority but, rather, whether the criminal intent for the crimes with which these defendants were charged is negated if they were acting in conjunction with an official who possesses only apparent authority. We hold, consistent with our sister circuits that have considered the question, that intent is not negated when a defendant cooperates with an official who possesses only *apparent* authority.

Essentially, defendants argue that, if they acted at the direction of an official who possessed apparent authority, they would lack the requisite *mens rea* for the crimes with which they were charged. According to defendants, under such a circumstance, they would have made only a mistake of fact — a cognizable defense negating intent when the *mens rea* requirement for a crime is at least knowledge — regarding whether DEA officials possessed actual authority to authorize their drug and money laundering activities. *See United States* v. *Fuller*, 162 F.3d 256, 262 (4th Cir. 1998) (stating that a mistake of fact is a cognizable defense to an offense requiring knowledge).

Any such defense is foreclosed, however, by our reasoning in *Kelly*. There, the defendant relied on a government informant who enlisted his help to assist in a government operation. 718 F.2d at 664. The defendant argued that if he acted at the invitation of the informant, he could not have possessed the requisite criminal intent for conspiracy to distribute drugs. *See id.* at 665. We disagreed, explaining that defendant's mistake arose not from "a mistake of fact as to

the [informant's] status, but resulted from a misconception of the legal prerogatives attached to that status." *Id.* We thus held that if the defendant "indeed acted on the basis of a mistake . . . it was a mistake of law, not a mistake of fact." *Id.* Of course, since defendant's error was a mistake of law, his belief did not constitute a defense to his criminal act. *See id.* at 665; *see also Fuller*, 162 F.3d at 262 ("[A] mistake of law such as claimed by Fuller is no defense because the background presumption must be that 'every citizen knows the law.'").

Though we did not address in *Kelly* whether a defendant's intent may be negated when he acts pursuant to an official's apparent authority, the reasoning of that case compels us to now answer that question in the negative. For, reliance on the apparent authority of a government official is nothing more than a mistake about "the legal prerogatives attached" to such status and thus constitutes a mistake of law. *See United States* v. *Rosenthal*, 793 F.2d 1214, 1235-36 (11th Cir. 1986) (stating that a "defendant may only be exonerated on the basis of his reliance on real and not merely apparent authority."); *Duggan*, 743 F.2d at 83 ("The mistake that defendants advance here as an excuse for their criminal activities — their reliance on Hanratty's purported authority — is an error based upon a mistaken view of legal requirements and therefore constitutes a mistake of law.").

Therefore, we hold that criminal intent is negated if two elements are met: (1) the defendant honestly believed that he was acting in cooperation with the government, and (2) the government official or officials upon whose authority the defendant relied possessed actual authority to authorize his otherwise criminal acts.

## 2.

Defendants also seek to introduce Lincoln's testimony to support their defense of public authority. The public authority defense allows "the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in a covert activity." *Baptista-Rodriguez*, 17 F.3d at 1368 n.18; *see also United States* v. *Achter*, 52 F.3d 753, 755 (8th Cir. 1995). Thus, in contrast to the innocent intent doctrine, this affirmative defense

allows a defendant to seek exoneration based upon his *objectively reasonable reliance* on the authority of a government official.

We have never addressed the scope of the public authority defense, and, in particular, we have never explained whether such a defense entitles a defendant to rely on the apparent authority of a government official or whether actual authority is necessarily required. However, we again find *Kelly* persuasive in answering this question. As explained above, *Kelly* stands for the proposition that any mistake about "the legal prerogatives" attached to a person's status is not a defense to a criminal act. *See supra* at 14. Our recognition of an apparent public authority defense would contravene *Kelly* by creating an affirmative defense in precisely such circumstances.[4]

Accordingly, we adopt the unanimous view of our sister circuits that the defense of public authority requires reasonable reliance upon the actual authority of a government official to engage him in a covert activity.[5] *See United States* v. *Pitt*, 193 F.3d 751, 758 (3d Cir. 1999) (stating that the public authority defense is limited "to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question"); *United States* v. *Matta-*

---

[4]The view we adopt today is also faithful to the common law origin of the public authority defense. As the Third Circuit has pointed out, under the public authority defense at common law "illegal actions committed by a public official or an officer of the law in the course of his duties were not crimes." *United States* v. *Pitt*, 193 F.3d 751, 756 (3d Cir. 1999). Thus, requiring an official to possess actual authority is consonant with the common law requirement that actions be taken "under color of public authority" for invocation of the defense. *United States* v. *Reyes-Vasquez*, 905 F.2d 1497, 1500 n.5 (11th Cir. 1990); *see generally* Paul H. Robinson, Criminal Law Defenses § 142 (1984).

[5]We recognize that Rule 12.3(a)(1) requires a defendant to provide notice to the government if he intends to claim either "a defense of actual *or believed exercise of public authority* on behalf of a law enforcement . . . agency at the time of the alleged offense." Fed. R. Crim. P. 12.3(a)(1) (emphasis added). Since Rule 12.3 is merely a notice provision and does not in any way alter the substantive legal standards with regard to the public authority defense, we agree with the Third Circuit's conclusion in *Pitt* "that the law in jurisdictions where actual authority was required was not altered" by the promulgation of Rule 12.3. 193 F.3d at 757.

*Ballesteros*, 71 F.3d 754, 770 n.12 (9th Cir. 1995) (stating that where "a CIA agent could not lawfully authorize the violation of the federal drug laws," the defense of public authority was not available); *United States* v. *Holmquist*, 36 F.3d 154, 161 nn.6-7 (1st Cir. 1994) ("The nonexistent defense of apparent public authority . . . must not be confused with the potentially viable defense of actual public authority which may come into play when a defendant undertakes certain acts, reasonably relying on the statements of a government agent cloaked with actual authority."); *Baptista-Rodriguez*, 17 F.3d at 1368 n.18 ("If the agent had no such power, then the defendant may not rest on the 'public authority'; reliance on the apparent authority of a government official is not a defense in this circuit, because it is deemed a mistake of law, which generally does not excuse criminal conduct.").

3.

The government requests that we decide as a matter of law that the newly discovered evidence is not material despite the deferential standard of review we employ in reviewing a district court's decision to grant a new trial. We decline to reach that conclusion because neither party has been furnished with an opportunity to introduce any evidence regarding whether Lincoln or his colleagues at the DEA possessed actual authority to sanction defendants' money laundering and drug activities. Furthermore, while Lincoln's testimony certainly suggests that these officials did not possess such authority, his testimony does not conclusively establish that this is so, especially with regard to Michael's drug activities. J.A. 1000-01 (testifying that *he would not authorize* Michael to conduct drug sales on behalf of the DEA).

Therefore, if defendants can establish at a new trial that DEA officials authorized them to conduct the operation and that such officials had the actual authority to do so, defendants would be entitled to appropriate jury instructions on the defenses of public authority and innocent intent.[6] Since the jury would then be entitled to acquit the

---

[6]Of course, as a result of our decision today, if the district court instructs the jury on innocent intent and the public authority defense at a new trial, it should also provide an appropriate instruction articulating that reliance on the apparent authority of a government official is not a viable defense.

defendants if it concluded that defendants' activities were legitimately authorized, we hold that the district court did not abuse its discretion in concluding that the newly discovered evidence is "material to the issues involved."

E.

The fifth element of *Custis* is whether the evidence is "such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." 988 F.2d at 1355. Much of our analysis on the third and fourth elements of *Custis* is equally applicable here. In particular, we again note that the persuasive value of Lincoln's testimony cannot be underestimated due to his status as a DEA agent who participated in the investigation of this case. Furthermore, as the district court observed, if the jury credits Lincoln's testimony that DEA officials may have led defendants to believe that they were acting pursuant to governmental authority, "it would certainly create[ ] a record more favorable for the Fulchers." J.A. 1055. Therefore, we cannot say that the district court abused its discretion in concluding that the newly discovered evidence "would probably produce an acquittal."

## *CONCLUSION*

For the foregoing reasons, the district court's decision to grant a new trial to defendants is affirmed and the case is remanded for further proceedings consistent with this opinion.[7]

*AFFIRMED*

---

[7]In light of our conclusion that the district court properly granted a new trial, we need address only one additional issue on appeal. Michael contends that his indictment was defective because it failed to provide him with proper notice of the three drug-related violations underlying the continuing criminal enterprise count. His argument is without merit, however, because the CCE count in the indictment expressly incorporated by reference the predicate drug violations upon which the jury relied in convicting Michael. *See United States* v. *Tipton*, 90 F.3d 861, 863 (4th Cir. 1996) (holding that an indictment which incorporated by reference the predicate drug-related violations was sufficient to provide adequate notice for a CCE count).