### UNITED STATES of America

### v.

### Michael FULCHER, Ethel Fulcher, Rosanna Fulcher.

### No. 7: 98CR00102.

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 8, 2002.

Charles David Whaley, Morchower, Luxton & Whaley, Richmond, VA, for Michael Edward Fulcher.

David Preston Baugh, Richmond, VA, for Ethel Vest Fulcher.

Gerald T. Zerkin, Gerald T. Zerkin & Assoc., Richmond, VA, Carolyn V. Grady, Epperly, Follis & Schrok, P.C., Richmond, VA, for Rosanna Sue Nichols Fulcher.

Rosanna Sue Nichols Fulcher, Roanoke, VA, pro se.

## *MEMORANDUM OPINION*

KISER, Senior District Judge.

Before me is the United States' (hereafter, the "Government's") Motion to Reinstate Jury Verdict and Motion in Limine on Remand from the Fourth Circuit Court of Appeals filed June 13, 2001.

In *United States v. Fulcher*, 250 F.3d 244 (4th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 313, 151 L.Ed.2d 233 (2001), the Fourth Circuit affirmed this Court's decision ordering a new trial on all charges against the defendants. *See United States v. Fulcher*, No. 7:98CR00102, slip opinion (W.D.Va. Feb.16, 2000). On remand, the Government moves to reinstate the jury's

convictions of the Fulchers based upon evidence which the Government placed in the record before this Court at a hearing on November 8, 2001. In the alternative, the Government argues that statements by Drug Enforcement Administration (DEA) Special Agent Donald O. Lincoln, produced since the first trial (hereafter "the Lincoln evidence"), be barred from evidence on retrial.

The parties fully briefed the issues and were heard in oral argument, making this matter ripe for disposition. For the reasons set forth herein, the Government's Motion to Reinstate the Verdict is **DENIED** and its Motion in Limine **OVERRULED.** The Lincoln evidence will be admissible for the defendants'· public authority defense, and other defense uses previously recognized by this Court.

## I. BACKGROUND

*Facts and Procedural History*

The facts have discussed exhaustively in this Court's Memorandum Opinion of February 16, 2000 (hereafter, "Mem.Op.") and in *Fulcher,* 250 F.3d at 246–248. In 1999, a Government named twenty two individuals in an indictment for engaging in drug and money laundering conspiracies. Specifically, the indictment charged that correctional officers at Bland Correctional Center ("BCC"), as well as wives, mothers, and girlfriends of inmates, smuggled marijuana into this Virginia state prison. The inmates then sold the marijuana in teaspoon-sized servings for twenty-five dollars each to fellow inmates. Unable to use cash behind bars, the inmates purchased the marijuana through money orders made out to friends and relatives of the inmate sellers. Of five defendants tried in August, 1999, three were found guilty of at least some the charges against them: inmate Michael Fulcher, his mother Ethel, and his wife Rosanna.

Prior to trial, Michael and Ethel filed notices under Fed.R.Crim.P. 12.3, stating that they intended to rely upon a "public authority" defense. They stated they "believed that, based upon past experience and circumstances, while not authorized at the time of commission, [their cooperation] would be subsequently ratified and permitted by federal and state law enforcement in the discharge of their duties." Specifically, they argued that Michael's communications with state and federal law enforcement officers in this case, along with his past work as a confidential informant for the Drug Enforcement Administration ("DEA") and other federal agencies, gave the Fulchers the impression that the Government had granted Michael permission to develop evidence against correctional officers and his fellow inmates. According to the proffered testimony, Rosanna and Ethel Fulchers' alleged money laundering activities, in particular, consisted solely of the maintenance of a "paper trail" of such evidence to use against the guards and inmates. The Fulchers wished to testify that their activities with regard to BCC were not significantly different from undercover cooperation they had given federal law enforcement agents in the past. In response, the Government filed a motion *in limine* barring any evidence of Michael's previous cooperation with law enforcement, and I granted the motion..

Following the Fulchers' convictions on drug and money laundering charges, and on the eve of sentencing, this Court received an *ex parte* letter from DEA Special Agent Donald O. Lincoln, in which Lincoln stated his concern that he, along with state law enforcement officers participating in a DEA Task Force at the time of the Fulchers' activities, may have provided BCC inmate Michael Fulcher and his family with the mistaken impression that Michael had approval to investigate alleged drug dealing involving guards at the pris-

on. Lincoln also acknowledged that on previous occasions Michael, trying to reduce his prison time, had investigated illegal activities without obtaining permission from government agents. In at least one instance, no agent ever told Michael that he could be prosecuted for aiding and abetting criminal activity; rather, the Government simply accepted and used the information which Michael obtained. In discussing the BCC marijuana ring, Lincoln admitted that he may have communicated to Michael and Ethel that a case could be presented to the DEA if it involved a larger quantity of marijuana or if interstate or international implications were raised. Lincoln also reaffirmed his previous testimony that, in his opinion, Michael had in fact gathered this evidence for potential prosecution. *See* Mem.Op. at 6–11 (discussing the Lincoln letter and his subsequent testimony at a hearing on post-trial motions).

Following disclosure of the letter to the parties, I granted the Fulchers' motion for a new trial, holding that the Lincoln evidence was relevant and favorable to the Fulchers: (1) on their public authority defense; and (2) on their mistake of fact defense. Mem.Op. at 14–26. I also held that the Lincoln evidence: (3) corroborated the Fulchers' position—not asserted at trial because uncorroborated at the time—that Michael never actually sold any drugs at BCC, and (4) made relevant Michael and Ethel Fulcher's proffered testimony of past, pre-indictment cooperation with federal law enforcement authorities—testimony which I had previously barred from trial.[1] Mem.Op. at 17–27. In addition, I held that: (5) new evidence putting prosecution witness Victoria Hairston's credibility in question, and (6) lack of evidence for Michael's Continuing Criminal Enterprise (CCE) conviction, might themselves warrant a new trial. Mem.Op. at 28–30.[2]

In discussing the relevance of the Lincoln evidence to the public authority defense, I held—as the Fourth Circuit would subsequently—that in order to prevail on this defense, the Fulchers would have to show that law enforcement officials had actual authority to authorize their otherwise illegal activities:

> With this affirmative defense, the defendant seeks exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in a covert activity. The validity of this defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the "public authority"; reliance on the apparent authority of a government official is not a defense in [the Eleventh Circuit], because it is deemed a mistake of law, which generally does not excuse criminal conduct.

Mem.Op. at 19 (*quoting United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1368 n. 18 (11th Cir.1994)). At this stage of proceedings, the elements of the public authority defense were not in dispute.

On appeal, the Fourth Circuit took up the Government's contention that the Lincoln evidence did not warrant a new trial because it was not "material" as required by *United States v. Custis*, 988 F.2d 1355,

---

1. At trial, the Fulchers sought to introduce evidence of Michael's past work as an informant, Ethel's assistance in such matters, and Ethel's and Rosanna's knowledge of this work to support their public authority.

2. Because I had already held that the Lincoln evidence warranted a new trial, I dismissed the Fulchers' arguments concerning Hairston and the CCE evidence as moot. Mem.Op. at 30–31.

1359 (4th Cir.1993). *See Fulcher,* 250 F.3d at 251.

The Government directed its argument at two of this Court's bases for granting a new trial—namely, that the Lincoln evidence was material to the "innocent intent" and public authority defenses. The Government argued that Lincoln's testimony at the December 27, 1999 post-trial hearing showed "that Lincoln and his colleagues possessed, at most, only apparent authority to approve the operation undertaken by the Fulchers, and that such authority was insufficient to either negate intent or to support the defense of public authority." *Id.* The defendants responded by arguing that if the defendants "acted at the direction of an official who possessed [merely] apparent authority, they would lack the requisite *men rea* for the crimes for which they were charged. According to defendants, under such circumstance, they would have made only a mistake of fact, a cognizable defense negating intent [when proof of a crime requires knowledge]." *Id.* Because of the defendants' particular position, which appears to have been advanced for the first time on appeal, the Fourth Circuit took up the issue. Consistent with other federal circuit courts which had the issue, the Fourth Circuit held that the defense of public authority "requires reasonable reliance upon the actual authority of a government official to engage him in covert activity." 250 F.3d at 253 (*citing, among others, Baptista-Rodriguez,* 17 F.3d at 1368 n. 18; *United States v. Pitt,* 193 F.3d 751, 758 (3rd Cir. 1999); *United States v. Holmquist,* 36 F.3d 154, 161 nn. 6–7 (1st Cir.1994)). The court also rejected defendants' argument that reliance upon a government actor's merely apparent authority constituted a mistake of fact, reiterating its prior holding that such a mistake arose not from a mistake of fact as to actor's status, "but resulted from a misconception of the legal prerogatives attached to that status." 250

F.3d at 253 (*quoting United States v. Kelly,* 718 F.2d 661, 665 (4th Cir.1983)). The court declined to rule in favor of the Government, however, noting that "neither party has been furnished with an opportunity to introduce any evidence regarding whether Lincoln or his colleagues at the DEA possessed actual authority to sanction defendants' money laundering and drug activities." 250 F.3d at 254. Affirming this Court's decision to hold a new trial, and remanding for further proceedings consistent with its opinion, the court reminded this Court of the defendants' burden at trial, and directed that any jury instruction on these defenses indicate that reliance on apparent authority was not sufficient. 250 F.3d at 254–255, 255 n. 6.

The Government immediately filed the present motion. Claiming that it could put evidence on the record proving that neither Donald Lincoln nor any of his colleagues at DEA had the actual authority to authorize the activities of the Fulchers, the Government urged this Court to hold an evidentiary hearing and, assuming the Government succeeded, to reinstate the Fulchers' guilty verdicts. In the alternative, the Government argued that the Lincoln evidence should be excluded at the new trial because it was irrelevant and would confuse the issues. Although I expressed strong doubts concerning the propriety of directing a guilty verdict based upon new evidence presented outside of the hearing of a jury, I allowed the Government a hearing on the ultimate admissibility of the Lincoln evidence.

At the hearing conducted on November 8, 2000, the Government sought to establish three reasons why Lincoln and his DEA Task Force colleagues did not have actual authority to permit the Fulchers' activities. According to its witnesses: (1) distributing controlled substances with no expectation of recovery ("letting the drugs

walk") and (2) conducting financial transactions with drug proceeds ("letting the money walk"), were unusual drug enforcement operations which required review and recommendation by the Justice Department's Sensitive Activity Review Committee ("SARC") following the preparation of an operational plan justifying the activity. Special Agent Donald Mendrala of the DEA's Undercover and Sensitive Operations Unit, a SARC member, testified that only DEA Headquarters could thereafter approve an operation in which drugs walked. According to Mendrala, as a matter of practice, only operations involving no more than a gram of controlled substance are ever approved in these cases. Mendrala also testified that only the Attorney General and Deputy Attorney General could authorize letting money walk. These authorizations were limited to the most significant investigations—such as tracking the money flow to the Cali cartel. According to Mendrala, less than twenty are in place nationwide. Mendrala testified that he had reviewed DEA records for such authorizations and found none in this case. He further testified that: (3) where a Confidential Informant ("CI") such a Michael Fulcher had been discharged for cause, or "blackballed," DEA headquarters had to approve the reactivation of the informant as a CI before he could be used to make an otherwise-illegal drug or money transactions.[3] If the informant was not reactivated, he was simply another unofficial Source of Information ("SI" or "SOI") who could not be given permission to participate in these transactions. Tr.Hearing, 83–90, 103–105.

Special Agent Lincoln testified similarly, corroborating Mendrala's testimony, and denying that he had statutory authority to authorize any such activities himself. He had himself sought and received proper authorization to make money pickups and transfer the proceeds to traffickers during the Javier Cruz investigation into the Cali Cartel, and was familiar with the requirements. He also knew that an agent cannot utilize a blackballed CI for sting operations without approval from DEA headquarters, and did not consider Michael Fulcher a CI in the 1990s. According to Lincoln, Fulcher merely volunteered information on a frequent basis, some of which Lincoln used or passed to other agencies. Lincoln did not direct his activities, however. Tr.Hearing, 14–42.

The Government argues that this testimony proves that Lincoln or the DEA Task Force for which he worked did not themselves have express or implied authority to allow the Fulchers to do the acts for which they were eventually charged, and that Lincoln and his colleagues did not in fact have permission from authorizing officials to allow these acts in the Fulchers' specific case. Therefore, the Government argues, there is no triable issue of fact concerning the Fulchers' public authority defense.

The defendants do not seriously dispute the testimony concerning DEA procedure. They do, however, argue that there is no evidence in the record that Agent Lincoln could not ratify the conduct of Michael Fulcher, once Fulcher's own investigation got to a size that might interest DEA in the case. They argue the record is replete with information that, in the past, Michael had been permitted to initiate investigations and to engage in acts which could be prosecuted as illegal—such as aiding and abetting the possession of controlled substances, conspiracy, and tax fraud—and which were subsequently ratified by the

---

**3.** Michael Fulcher, a former CI for DEA, had been terminated as of March 14, 1990 for leaking details of an ongoing investigation, and never reinstated. Tr.Hearing, Ex. 2 (approved Form DEA 6).

DEA or other law enforcement agencies. They argue that indeed this had been a frequent course of dealing between Fulcher and law enforcement agencies—both before and after his discharge as a confidential informant.[4] In oral argument, their position consistently has been that all evidence relevant to their affirmative defenses must go before a jury.

The Fulchers also point out—as this Court had noted in its earlier Memorandum Opinion—that their position with regard to the facts of the case will be different on retrial. For example, it will be Michael Fulcher's position at the new trial that he never actually sold drugs at BCC, and Mrs. Fulcher's position that she never forwarded, distributed, or saw any marijuana while Michael was an inmate there. According to the Fulchers, the Lincoln evidence would corroborate these positions, and therefore has relevance apart from its usefulness to a public authority defense.

## II STANDARD

■ "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by [the Federal Rules of Evidence], or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." Fed.R.Evid. 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Relevance is, of course, question for the trial judge to decide. Fed.R.Evid. 104. However, in determining whether evidence is relevant, the district court "may not consider the weight or sufficiency of the evidence. Its consideration should be limited to whether the

evidence has any tendency to support a consequential fact." 2 *Weinstein's Federal Evidence*, 2nd ed., § 401.06, pp. 401–403 (Bender 2001) (citations omitted). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury." Fed. R.Evid. 403.

■ A trial court does not violate a criminal defendant's Fifth or Sixth Amendment rights when it excludes proffers of exculpatory evidence, if that evidence is not material (i.e., would not with reasonable probability affect the outcome of trial), or when the evidence is not favorable to the defendant's case. *See, e.g., United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *United States v. Bennett*, 675 F.2d 596, 598 (4th Cir.), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307 (1982). It is also not a violation of constitutional rights to exclude exculpatory evidence otherwise inadmissible under the Federal Rules of Evidence. *Sharlow v. Israel*, 767 F.2d 373 (7th Cir.), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

My evaluation of the Lincoln evidence is thus restricted to whether it is relevant to the Fulchers' defenses at trial, whether it is material and favorable to the defendants, and whether its probative value is substantially outweighed by the risk of confusion of the issues or misleading the jury.

## III DISCUSSION

A. *The Lincoln evidence is relevant, material, and favorable to the defendants' public authority defense.*

In *Baptista–Rodriguez*, 17 F.3d at 1368 n. 18, *accord, Fulcher*, 250 F.3d at 253, the Eleventh Circuit explained the public authority defense:

---

4. The relevance of this evidence is discussed in Sec. III of this Opinion.

With this affirmative defense, the defendant seeks exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in a covert activity. [*United States v.] Anderson,* 872 F.2d [1508], 1513 (11th Cir.), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989) ]; *see United States v. Reyes–Vasquez,* 905 F.2d 1497, 1500 n. 5 (11th Cir.1990), *cert. denied,* 501 U.S. 1237, 111 S.Ct. 2869, 115 L.Ed.2d 1035 (1991). The validity of this defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the "public authority"; reliance on the apparent authority of a government official is not a defense in this circuit, because it is deemed a mistake of law, which generally does not excuse criminal conduct. *Anderson,* 872 F.2d at 1515; *United States v. Rosenthal,* 793 F.2d 1214, 1236, *modified on other grounds,* 801 F.2d 378 (11th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). A defendant legitimately may rely, however, on a government official's real authority to authorize the defendant's conduct. *Anderson,* 872 F.2d at 1515; *Rosenthal,* 793 F.2d at 1235–36; *see United States v. Lopez–Lima,* [738 F.Supp. 1404,] 1408 [ (S.D.Fla.1990) ]. Actions properly sanctioned by the government are not illegal.

The issue before the Fourth Circuit in *Fulcher,* and the issue before me now, is whether there is any relevant evidence that the DEA agents with whom the Fulchers dealt had actual authority to engage them in an illegal activity.

 For argument's sake, I assume that the Government's testimony has shown that these agents had no statutory authority, and no authority implied by their positions as field agents, to engage the Fulchers. Nevertheless, it remains an open question whether they acquired actual authority to do so by other means. At common law, an agent's "actual" authority to bind his principal may be express or implied. Actual authority may be implied to the extent reasonably necessary for the agent to have in order to carry out his express authority, may be implied according to customs and usages of a trade, or may be implied in an emergency to protect the principal's interest. 2A Corpus Juris Secundum *Agency,* §§ 154, 156. The law may also imply actual authority from a course of actual conduct:

From conduct of the principal manifesting an assent to the exercise by the agent of powers not expressly granted, considered in light of the relevant circumstances, authority may be implied for the performance of the acts of like general character as those assented to, on the same basis as assent is implied in fact with reference to other contracts generally.... *At least if the rights of a third person are involved, powers will be implied on the basis of conduct despite the failure of the express agreement to give such powers, and indeed, even though they are specifically prohibited by the original agreement creating the agency ....* Any implication of authority from the conduct and relations of the parties and the circumstances of the case must be limited, however, to acts of the character of those which the supposed assent is given or incidental thereto, and does not extend to acts or transactions which are generically different.... *Authority may be implied where the principal habitually or regularly permits the agent to pursue a particular course of conduct, or has repeatedly acquiesced in and adopted similar acts by the agent ....* Although more convincingly deducible from a series of transactions and not capable of

establishment from any single act or matter standing by itself, it may, nevertheless, be implied from a single transaction.... Conduct and circumstances subsequent to the transaction are pertinent and may be considered in determining what was the mandate of the agent.

2A C.J.S. *Agency* § 155. Pp. 783–784 (*citing, among numerous others, Penthouse Intern., Ltd. v. Barnes,* 792 F.2d 943, 947 (9th Cir.1986) (photographer had implied actual authority to add handwritten term "AKA" to modify magazine's model release contract to require that only fictitious name could be used in connection with photographs of model, where photographer had previously placed such term on other contracts with no objection from magazine) (emphasis added). *See also United States v. Flemmi,* 225 F.3d 78, 90 (1st Cir.2000) (federal prosecutor could ratify FBI agents' unauthorized promise of immunity to informant for racketeering sting, if he knew of it, failed to repudiate it, and accepted its benefits) (discussed further below), *cert denied,* 531 U.S. 1170, 121 S.Ct. 1137, 148 L.Ed.2d 1002 (2001); *FDIC v. Barrasso,* 791 F.2d 1529, 1531 (11th Cir. 1986) (general partner's acquiescence to his agent's series of acts gave agent authorization to perform similar acts in the fu-

ture); *Unit. Tech. Com. v. Intern. Broth. of Elec. Wkrs,* 597 F.Supp. 265, 284 (S.D.N.Y.1984) (foreman and shop steward became agents of union for purposes of illegal work stoppages when they acted in furtherance of union's total job policy, and union failed to take any action to curtail stoppages)).[5]

■■■ Implication from a course of dealings has broader consequences than a one-time "ratification." Ratification occurs when an agent acts without authority and the principal—with knowledge of all material facts—subsequently adopts the transaction by express affirmation, acceptance of the benefits of the transaction, or silence. Ratification apparently only creates implied actual authority for the agent in the disputed transaction. "Course of dealings," however, creates implied authority to do similar acts in the future.[6] In this case, the theory of defense would have to be that the principal and agents had a course of dealings in which they ratified past illegal activities by Fulcher either by silence or acceptance of benefits (prosecutions). This course of dealings in which actual authority was created by repeated ratifications gave agents implied authority, in this case, to let the Fulchers conduct enough low-level illegal activity to develop a case warranting federal investigation.[7]

---

5. For numerous other instances of principal acquiescence and its consequences, *see* Court Citations, Restatement of the Law (Second) Agency, § 43 ("Acquiescence by Principal in Agent's Conduct") (ALI 1984, cum. supp. 2001).

6. The C.J.S. suggests that a ratification of even one "dealing" may, in the right circumstances, also create implied authority going forward. *Id.* (*citing, among others, R.V. Smith Supply Co. v. Stephens,* 169 Okla. 555, 37 P.2d 926, 929 (1934) (authority may be implied from single act; question concerning whether salesman had implied authority to make contracts permitting return of goods may go to jury where there was only one return credit memorandum in evidence)).

7. For purposes of applying agency principles, I consider the "principal" in this case to be any relevant entity who had statutory authority to approve the Fulchers' activities—in particular, DEA Headquarters, or the U.S. Attorney's Office, as counsel for the United States. "Agents" would appear to be any government agents who reported to the U.S. Attorney in these kinds of matters, i.e., DEA Agents, but also members of the DEA Task Force during the events in question, as well the IRS and ATF in some past cases. For purposes of the public authority defense, the Fulchers were "third parties."

■ An element that will be difficult for the Fulchers to prove is knowledge by the principal of the agent's conduct, "which is not only relevant but essential to the existence of implied power." 2A C.J.S *Agency* § 155 "[S]omething must have been done from which the assent of the principal to the particular act in dispute, or acts of that class, can reasonably be inferred." *Id.* Affirmative acts of the principal are not required, however, since "knowledge of, and acquiescence in, the agent's acts may be enough and may even rest in inference if the agent's course of dealing has been for such time and of such character as to justify the inference." *Id.* (citations omitted).

■ Furthermore, a third party's belief is irrelevant to establishing ratification or "course of dealings" authority. *Id.* (*citing Esso Intern., Inc. v. S.S. Captain John*, 443 F.2d 1144, 1148 (5th Cir.1971) ("what [a third party] knew or should have known is irrelevant when one is attempting to establish an implied agency. It is the manifestations of the alleged principal and agent as between themselves that is decisive and not the appearances to a third party or what that third party should have known") (*citing in turn* Restatement (Second) of Agency § 7 (1958); 2 C.J.S. Agency § 99 c)). This is essentially the difference between actual authority implied by course of conduct and apparent authority: to determine the former, a court looks only to the dealings between the principal and agents.[8]

In this case, the parties have tended to pursue straw men arguments when it comes to the course of dealings theory, with the defendants arguing that past failures to prosecute Michael Fulcher for illegal activity constituted ratifications by themselves, and the Government arguing

correctly that prosecutors generally have discretion not to prosecute, but arguing incorrectly that this discretion necessarily stymies the Fulchers' public authority defense. Rather, what the Fulchers have to show is that there is at least one past instance in which U.S. agents—without expressly authorizing Michael Fulcher via SARC review or U.S. Attorney letter—permitted him to commit illegal acts for the purpose of developing information that might lead to an official investigation. Furthermore, they must show that the U.S. Attorney's office knew about these acts at some point and either (1) expressly approved them; (2) accepted the benefits of them by developing a prosecution; or (3) looked the other way. Failure to prosecute Fulcher for these acts is, of course, a necessary condition of this showing, but it does not prove the defense.

There is some precedent for this defense in cases in which the Government is a party. In *Frank L. Black, Jr., Inc. v. U.S.*, 1982 WL 36720, *12 (Ct.Cl. Trial Div.), a civil case, the court discussed Supreme Court precedent concerning a valid use of the above principles:

This court has also recognized that the government can be bound by the acts of agents without actual authority when the agent has been knowingly held out as having the necessary authority. In *George H. Whike Construction Co. v. United States*, 135 Ct.Cl. 126, 131, 140 F.Supp. 560, 564 (1956), the plaintiff sought to hold the government liable for the representations of an agent who had no actual authority. The evidence indicated that *the government official who possessed the actual authority to make the representations in question was aware that his subordinate had made*

---

**8.** The C.J.S. points out that the third-party's perception and reliance is, of course, relevant to a claim of estoppel. The C.J.S. also notes

that the same facts often establish both apparent authority and actual authority. *See, e.g., Esso Intern.*, 443 F.2d at 1148 n. 2.

*the representations and no attempt was made to deny the representations* at the time they were made. The court acknowledged the rule that actual authority is necessary to bind the government but went on to hold that justice required an exception to this rule. In these circumstances to permit Government legal representatives who had such positions and were acting in such circumstances as to lead any normal person to regard them as having capacity to act in the matter, to escape responsibility completely would be like authorizing Government employees to set a trap to lure the unwary into signing a contract.

(Emphasis added.)

The principle of implied authority through ratification has been recognized by a federal circuit court in at least one criminal context. In *Flemmi*, an informant had been promised use immunity in a racketeering sting by two FBI agents who had neither express authority nor authority implied by position to give it. The First Circuit acknowledged that their promise could still have been ratified:

> In principle, the government may be bound by an unauthorized agreement if a properly authorized official subsequently ratifies it. *See, e.g., Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1433 (Fed. Cir.1998); *Carr v. Runyan,* 89 F.3d 327, 331 (7th Cir.1996), 89 F.3d at 332; *Howard v. United States,* 31 Fed.Cl. 297, 314 (Fed.Cl.1994). But no express ratification transpired here, and ratification can be implied only when the ratifying official knows of the agreement, fails to repudiate it in a timely manner, and

accepts benefits under it. *See United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901); *Carr,* 89 F.3d at 332; *Ouimette v. E.F. Hutton & Co.,* 740 F.2d 72, 78 (1st Cir.1984); *see also* Restatement (Second) of Agency § 43, at 134.

225 F.3d at 90.

The Government may have made a convincing case that DEA agents had no statutory authority, and no authority implied by their position, to engage the Fulchers in the activities for which they were indicted. However, the Government has not persuasively addressed the long course of dealings between Fulcher and federal law enforcement officials in which the Government may have knowingly accepted the benefits of unauthorized behavior by the Fulchers in the past. Although the Government argues correctly that failure to prosecute that behavior is not the same as ratification, this does not settle the matter. If the Government has knowingly ratified unauthorized behavior during its course of dealings with the Fulchers, the law of agency allows the Fulchers to have relied upon the implied actual authority of DEA agents to permit them to do similar acts with regard to the BCC investigation.[9]

All of this may, of course, be very difficult for the Fulchers to prove. However, there is already some evidence in the record which suggests such ratifications may have occurred. For instance, when Michael became an official CI for DEA in 1984, he was required to sign a "Statement of Understanding." The document set forth the rules under which Michael could operate, and contains representations such

---

**9.** Since the focus of an implied authority determination is on course of dealings between the agent and his principal, evidence of implied authority in this case is not limited to federal agents' dealings with the Fulchers. Evidence of instances in which the Government allowed the agents involved in this case to permit or "look the other way" with regard to similar illegal acts by other informants would strengthen the case that these agents had implied authority to do the same with regard to the Fulchers.

as "I cannot and will not commit any crime whatsoever," "If I do violate any criminal law I can and will be prosecuted," and *"Any cooperation given to the DEA will be brought to the attention of the U.S. Attorney's Office."* Tr. Hearing, November 8, 2001, Ex. 1 (emphasis added). These authorized representations may establish two key elements of Michael's defense, assuming Michael can offer sufficient examples: (1) that the U.S. Attorney's Office or DEA headquarters knew of any illegal behavior by Michael while he was a CI; and (2) that they ignored it or ratified it by using the information gained through illegal activity in prosecutions, without prosecuting Fulcher himself. In other words, Michael's activity while a CI could show that the U.S. Attorney's Office and DEA had a course of dealings with Fulcher in which they routinely ignored their own authorization procedure.

Examples of this kind of custom may be found in Fulcher's pre–1990 drug transactions, in which he would "circulat[e] in a level of society" until he found opportunities to purchase drugs; he would then call Lincoln for permission to buy and transport the drugs. *See* Tr. Hearing at 52. Presumably, the amounts involved would also have allowed the Government to prosecute Fulcher for intent to distribute and conspiracy as well as possession, if it had a mind to. While not as egregious, in the eyes of Justice Department policy, as "letting drugs walk" or "letting the money walk," there is no indication that any kind of sign-off procedure was used in these instances. *See, e.g.,* Tr. Hearing at 55–56 (in which Lincoln describes how an undercover investigation is properly "initiated"). At one point during Michael's term as a CI, the DEA "loaned" him to the ATF to assist with a weapons investigation. Lincoln could not say, however, whether Fulcher's undercover weapons buys for the ATF involved any specific approval by the U.S. Attorney; he also has never seen

formal initiation reports generated prior to those stings. Tr. Hearing at 57–58. Yet if the Government prosecuted parties based on Fulcher's actions in such circumstances, it presumably knew and accepted the benefits of the illegal activity approved initially by lower-level law enforcement agents.

The Government's position has been that Fulcher was "official" prior to 1990, and that evidence of illegal activity by him during investigations within this period is irrelevant. But if the Government ratified DEA's use of illegal behavior while Fulcher was a CI—in contravention of its own rules and representations to Fulcher—there is no reason to believe they must have stopped this course of dealings after Fulcher lost his official status. For instance, the Court found after the first trial that:

> on previous occasions Michael, trying to reduce his prison time, *had investigated illegal activities without obtaining permission from government agents.* Although sometimes placing Michael in danger, Lincoln testified that in some instances government agents did not tell Michael that they would not pursue his information because he had impermissibly placed himself in danger; rather, investigators often accepted the information obtained by Michael despite the threat of danger. Michael endangered himself, for instance, when preparing the tax fraud case for the IRS in 1993, and yet *the Government relied on Michael's efforts anyway. Furthermore, Lincoln testified that no one ever told Michael he could be prosecuted for his actions in the IRS case, even though he had aided and abetted criminal activity while gathering the information.*

Mem.Op. at 10 (emphasis added). *See also* Tr. Hearing at 12 (Fulcher possessed the typewriter on which the bogus returns had been typed, an act which could constitute

conspiracy or aiding and abetting tax fraud); 44–45 (Lincoln taught Fulcher how to develop a case, including the "paper trial;" when Fulcher approached Lincoln about the IRS cases in 1993, he had already established one, with documented evidence kept by his mother); and 58–59 (the investigation would have been authorized only after Fulcher turned his evidence). In his testimony concerning the IRS cases, Lincoln admitted all the (elements of a direct Government ratification of Fulcher's behavior, as well as tacit approval by law enforcement agents and the U.S. Attorney's office). The same can be made with regard to Mrs. Fulcher's loans of "flash money" to Michael. Tr. Hearing at 53. In such instances, she would have been at least guilty of conspiracy. Lincoln testified that he knew Michael generally used family members to help in most of his investigations. Tr. Hearing at 59. However, Rosanna and Ethel Fulcher were never required to sign a Statement of Understanding, and were never made CI's. The Fulchers have alleged that proof of similar ratifications exists with regard to the ATF weapons case, a high-profile drug prosecution in the Western District of Virginia,[10] and other cases. Thus, the fact that Michael Fulcher was no longer an official CI after 1990 appears not to be particularly significant.

"Lincoln admitted that, even when Michael previously investigated crimes without out government approval, the information he gathered was still helpful. As Lincoln explained, '[the DEA doesn't] turn down information.'" Mem.Op. at 11 (*citing* Lincoln June 29, 1999 Test. at 25.) Although Lincoln's statement is not *per se* an admission of ratification, a logical inference can be made that if the DEA ever used, in prosecutions, information from unautho-

rized investigations that involved illegal acts by Michael, the U.S. Attorney's Office at some point would likely have known about Michael's unauthorized activity. Knowing acceptance of the benefit of this information would constitute ratification of the unauthorized investigation in question and help support the claim that this was a customary practice.

The Fulchers had been convicted for activities involving the sale of very small ("teaspoon-size") quantities of marijuana at BCC. Though federal law enforcement agents may not have statutory authority to let money or drugs "walk," they do have implied authority to overlook *de minimus* transactions. For instance, sometime during an ATF investigation, Fulcher procured for himself an unregistered gun with a silencer, of which the U.S. Attorney's Office knew. Tr. Hearing 80–81. Even if the U.S. Attorney's decision not to prosecute Fulcher over the gun was not—by itself—a ratification of his purchase, the incident still severely undercuts the Government's assertions that DEA agents would have a absolute duty to turn in Fulcher if they knew he sold even very small amounts of drugs or let very small amounts of money walk. Indeed, Special Agent Mendrala admitted on cross examination that he could conceive of instances involving $30 worth of drugs or advanced drug money which DEA would not have to report to the U.S. Attorney.

Q. [A]s a supervisor, you're not going to fire anybody because they [didn't] turn in mama's phone call about the dime bag?

A. Right.....

Tr. Hearing at 91.

Mendrala also admitted that the DEA manual allows insignificant (a gram of cocaine or less) amounts of drugs to walk

---

**10.** *U.S. v. Robert Keith Needy,* Crim. No. 7:99CR00742 (W.D.Va.1993) and several related prosecutions.

when given, for example, as samples. Tr. Hearing at 100–101. These examples undermine the Government's representation that DEA Agents can't permit or acquiesce in an informant's decision to engage in distribution or "laundering" in *de minimus* amounts.

■ In holding earlier that the Fulchers should have a new trial, I necessarily found that the Lincoln evidence was material to the Fulchers' public authority defense, and would probably result in acquittal at trial. Mem.Op. at 13 (*citing* Fed. R.Crim.P. 33); *United States v. Rhynes*, 196 F.3d 207, 218 (4th Cir.1999) (other citations omitted). I found this using a definition of the public authority defense which required DEA agents to have actual authority. The Fourth Circuit affirmed. 250 F.3d at 254–255. On this third review, I again find the Lincoln evidence, as well as evidence of the Fulchers' history of cooperation with law enforcement, to be relevant, material and favorable to the Fulchers' defense. Accordingly, I deny the Government's motion to exclude the evidence.

B. *The Lincoln evidence is relevant, material, and favorable to the Fulchers on the defense of estoppel by entrapment.*

Following receipt of the Lincoln letter, the Fulchers have also advanced "estoppel" or "entrapment by estoppel" as a separate defense. In *Baptista–Rodriguez*, the court defined the defense as follows:

[Another] possible defense in cases like the present one is "entrapment by estoppel." This defense applies when a government official tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime in reasonable reliance on the official's representation. *See United States v. Hedges*, 912 F.2d 1397, 1405 (11th Cir.1990); *United States v. Clegg*, 846 F.2d 1221, 1222 (9th Cir.1988)

(applying defense to defendant who claimed government officials solicited, encouraged, and assisted his efforts to smuggle weapons to rebels in Afghanistan).

17 F.3d at 1368 n. 18, *accord, Pitt*, 193 F.3d at 758; *Holmquist*, 36 F.3d at 162 n. 10. In *United States v. Smith*, 940 F.2d 710, 714 (1st Cir.1991), the court distinguished this defense from mens rea defenses as follows:

Unlike [the "innocent intent" defense], entrapment by estoppel rests upon principles of fairness, not defendant's mental state. The defense may, therefore, be raised in cases like this in which the offense has no requirement of specific intent. *See United States v. Hedges*, 912 F.2d at 1405.... The defense of entrapment by estoppel is predicated upon fundamental notions of fairness embodied in the Fifth Amendment's due process clause. Whether the prosecution of a defendant violates his due process rights depends not solely upon whether he was incorrectly informed or misled by a government official, but upon the totality of the circumstances surrounding the prosecution.

The Third Circuit has explained that the defense "rests not on the defendant's state of mind, but on a due process theory that shifts the focus from the conduct of the defendant to the conduct of the government." *Pitt*, 193 F.3d at 759.

The Government did not argue against the applicability of this defense on appeal in *Fulcher*, and it was not discussed in my Memorandum Opinion. This may be due to the Government's position that entrapment by estoppel is identical to the public authority defense. *See* Government's Reply to Defendants' response to Government's Brief in Support of Motion to Reinstate Jury Verdict, 3 ("[t]he public authority defense is also known as 'entrapment by estoppel.' "). As the deci-

sions cited above make clear, entrapment by estoppel is a separate defense. *See also,* Mark S. Cohen, "Proof of Defense of Entrapment by Estoppel." 53 *Am.Jur. Proof of Facts* 3d 249, § 20 (explaining that entrapment by estoppel, unlike the public authority defense, does not require the government to have actually asked the defendant to engage in the prohibited conduct).

The defense appears to be a fundamental fairness exception to the often harsh rule that ignorance of the law is no excuse. By shifting the focus of judicial inquiry from government actors' status to those actors' actions within the totality of circumstances, entrapment by estoppel does not require a threshold determination that the government actor was *correct* in making his representations. Indeed, *Pitt, Holmquist,* and *Baptista–Rodriguez* were all cited by the Fourth Circuit in *Fulcher* for the rule that reliance on "apparent" public authority was no defense. 250 F.3d at 254. Yet in each of these three cases, courts adjudicated the viability of an entrapment by estoppel defense separately from the viability of the public authority defense. *See Pitt,* 193 F.3d at 757–758 (rejecting an instruction on the public authority defense because there was no evidence of actual authority, but holding that an "entrapment by estoppel instruction was the proper instruction"); *Holmquist,* 36 F.3d at 162 (a defendant's mistaken belief that his acts were authorized might negate specific intent under an estoppel by entrapment theory) (*citing U.S. v. Anderson,* 872 F.2d 1508, 1517 (11th Cir.) (rejecting apparent public authority defense, but acknowledging that defendant's mistaken belief that his acts were in fact properly authorized might negate specific intent), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989)); *see*

*also Baptista–Rodriguez,* 17 F.3d at 1368 n. 18 (explaining entrapment by estoppel as a defense distinct from the public authority defense).

The positions of the parties in *Pitt* were nearly identical to the present case. In *Pitt,* a drug defendant sought to use evidence of his reliance on U.S. Customs' agents implicit permission to make the alleged deal. Like the Government in this case, the prosecution in *Pitt* opposed the defense as a matter of law because only the Director of Customs, in conjunction with a sign-off from the U.S. Attorney, could sanction a foreign drug deal of the magnitude involved in that case. 193 F.3d at 757. Against this, the defendant proffered evidence of past contracts with Customs to work as a confidential informant, the fact that Customs agents *were aware that Pitt would work on cases without a specific contract,* and agents' *knowledge of his plan. Id.* Like Fulcher, Pitt argued that "it could be inferred that he *was authorized to engage in preliminary transactions . . . to gain the confidence* of the Colombian cartel." *Id.* (emphasis added). The Third Circuit upheld the district court's refusal to instruct on a public authority defense. However, the circuit court, like the district court before it, held that Pitt's evidence justified the submission of the entrapment by estoppel defense. 193 F.3d at 758.

 Indeed, entrapment by estoppel fits this case even better than it did the facts in *Pitt.* In *Pitt,* government agents denied all knowledge of the drug transaction. The jury in *Pitt* thus had to make what was essentially a credibility determination. Here, Lincoln has admitted knowledge of at least part of Fulcher's plan, and corroborated defendant's assertions that other DEA Task Force members knew of it too.[11] The Lincoln

---

**11.** The Lincoln evidence corroborates Michael Fulcher's claim that Boutetourt County

evidence, all other evidence concerning government representations to the defendants, the government's past mode of operating with Fulcher, and "defendant's belief that the conduct would later be ratified or accepted by law enforcement officials," are all relevant and favorable to the Fulcher's defense of entrapment by estoppel, and will be admissible for that purpose as well.

## C. The probative value of the Lincoln evidence is not substantially outweighed by risk of confusion of the issues.

█ "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury." Fed.R.Evid. 403. As I have explained above, the Lincoln evidence is relevant to the defenses of public authority and entrapment by estoppel, as well as other defense positions newly articulated by the Fulchers. Indeed, this evidence has already warranted a new trial and caused a substantive change in the defendants' strategy even as to *actus reus* elements of the crimes charged. Though testimony heard during the hearing of November 8, 2001 diminishes its weight as to the public authority defense, it is still the most probative evidence the defendants have with which to establish certain elements of their affirmative defenses, and its corroborative effect on all defenses is undeniable. Furthermore, I do not find the risk of confusion of issues substantially to outweigh the probative value of the evidence. Given the Fourth Circuit's clarification of the public authority defense in

*Fulcher,* it is certainly possible to provide jury instructions and closing arguments which make clear to the jury what elements of that defense have to be established by the evidence. If the Fulchers ultimately fail to provide more than a scintilla of evidence for any element of their affirmative defenses, I will still have discretion to deny an instruction on one or both of these defenses and to give the appropriate limiting instruction.

## D. Reinstatement of the guilty verdicts would be procedurally inappropriate.

█ The weight of the Government's evidence notwithstanding, I do not feel that exclusion of entire affirmative defenses is appropriate at this stage in the proceedings. Certainly, reinstatement of the guilty verdicts is not procedurally appropriate.

For one, the Government has provided me with no precedent in which a district court has reinstated guilty verdicts after granting a new trial, especially upon the basis of new, substantive evidence presented outside of the hearing of a jury and over the objections of the defendants. Unlike in normal hearings of motions *in limine,* in which threshold questions of relevance and foundation are determined, the Government essentially asks me here to pass summary judgment on an entire category of exculpatory defenses. Having found previously that at least some of the Lincoln evidence is favorable to the Fulchers, I do not see how I could grant the Government's motion now without inappropriately ruling on the weight of the evidence.

---

Sheriff Reed Kelley and Deputy Sheriff Kenny Parker also believed Fulcher's proposed sting operation had been approved by the Govern-

ment, and discussed details of a possible operation outside of the Bland prison with him.

Second, I am mindful that the Government's motion did not require the Fulchers themselves to come forth with all of their evidence-in-chief for their asserted affirmative defenses, and the Fulchers did not testify at the November 8, 2001 hearing. The Government presented its motion as one in which it sought to introduce evidence which it said would foreclose any public authority defense. To have required the Fulchers to put on their entire defense with a motion to reinstate guilty verdicts pending would have been equivalent to conducting a mini-trial outside of the hearing of the jury. Absent such a mini-trial, we do not yet know exactly what representations or admissions, if any, were made to the Fulchers concerning DEA and Justice Department procedure or what authorizing officials might have known or said about their plans. Jury trial is the appropriate vehicle for hearing this evidence.

Third, the Lincoln evidence is relevant to more than the public authority defense. As I previously held in the Memorandum Opinion, the Lincoln evidence both corroborates the Fulchers' position that Michael never actually sold any drugs at BCC, and makes relevant Michael and Ethel Fulcher's proffered testimony of past, pre-indictment cooperation with federal law enforcement authorities, testimony which I had previously barred from trial. Mem. Op. at 17–27. The Government did not challenge these holdings on appeal. They are now the law of the case. In addition, I held that new evidence putting prosecution witness Victoria Hairston's credibility in question, as well as lack of evidence for Michael's Continuing Criminal Enterprise (CCE) conviction, might themselves warrant a new trial. Mem.Op. at 28–30. The Lincoln evidence is also relevant to the entrapment by estoppel defense. Thus, even were I inclined to grant the Government's argument with regard to the public authority defense, reinstatement of the guilty verdicts is not warranted.

Fourth, there already exists a procedure by which I can bar the Fulcher's reliance defenses based upon the weight of the evidence. Fourth Circuit courts may also refuse to give jury instructions on a theory of defense when there is no more "than a mere scintilla" of evidence in support of it. *United States v. Phan*, 121 F.3d 149, 153 (4th Cir.1997); *United States v. Singh*, 54 F.3d 1182, 1189 (4th Cir.1995). This rule strikes a fair balance between letting a criminal defendant defend himself at trial and keeping the jury's deliberation free of frivolous affirmative defenses or confusing evidence. If the Fulchers fail at trial to present more than a mere scintilla of evidence concerning actual authority, I am free to grant an appropriate motion to strike the whole defense.

Finally, I note that the Government argued on appeal that the Lincoln evidence was cumulative "because the defendants could have testified regarding their own intent and, in particular, Michael could have testified about his conversations with Parker or Lincoln." 250 F.3d at 250. Having taken the position that the Fulchers could have testified on these matters at the first trial, the Government is not free now to argue that they cannot.

## IV CONCLUSION

For the foregoing reasons, the Government's Motion to Reinstate the Verdict is **DENIED** and its Motion in Limine **OVERRULED**. The Lincoln evidence will be admissible for the defendants' public authority defense, and other defense uses previously recognized by this Court.

An appropriate order shall issue.

## *ORDER*

Before me is the United States' (hereafter, the "Government's") Motion to Reinstate Jury Verdict and Motion in Limine on Remand from the Fourth Circuit Court of Appeals filed June 13, 2001 [Document No. 546], as well as Defendant Michael Fulcher's Motion to Adopt Co–Defendants' Response to Government's Brief and Motion to Reinstate filed December 11, 2001 [Document No. 566], and Rosanna Fulcher's motion to adopt and have the benefit of Ethyl and Michael Fulcher's responses to the Government's brief and Motion to Reinstate, stated in her Defendant's Response to the Government's Brief in Support of Motion to Reinstate [Document No. 567] (collectively, "Fulchers' Motions to Adopt").

The parties were heard in oral argument before the Court on August 31, 2001 and November 8, 2001. For reasons set forth in the Court's Memorandum Opinion, filed contemporaneously herewith, the Government's Motion to Reinstate Jury Verdict is **DENIED** and its Motion in Limine **OVERRULED**. It appearing that there has been no objection to the Fulchers' Motions to Adopt, those Motions are **GRANTED**.

The Clerk is directed to send a certified copy of this Order to all counsel of record.